In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-1185

GREEN PLAINS TRADE GROUP, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ARCHER DANIELS MIDLAND COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:22-cv-02067 — **Colin S. Bruce**, *Judge.*

_____

ARGUED SEPTEMBER 20, 2023 — DECIDED JANUARY 12, 2024

_____

Before RIPPLE, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Green Plains Trade Group, LLC ("Green Plains") appeals from the district court's grant of Archer Daniels Midland Company's ("ADM") motion to dismiss. Green Plains based its claim for tortious interference with contract on allegations that ADM unlawfully manipulated the price of ethanol downward, causing Green Plains to receive less money for the ethanol that it sold to third parties. Sitting in diversity and endeavoring to apply Nebraska state

law, the district court indicated the Nebraska Supreme Court *might* adopt Green Plains's theory. Nevertheless, the district court declined to do so here. Instead, the court read our case law as forbidding such a course because it constituted an application of state law in a manner not yet adopted by the Nebraska Supreme Court.

A federal court sitting in diversity has a basic constitutional responsibility to ascertain correctly the content of state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When the highest court of the state has not spoken on the matter, this inquiry can be difficult, but it cannot be avoided. In such situations, our case law, and that of the Supreme Court, instructs us to search elsewhere for a persuasive indication of how the highest court of the state would rule if the present case were before that tribunal today. Over time, we have articulated several "guardrails" to guide and discipline our decision-making process. One such maxim counsels district courts against accepting novel state law claims when the evidence concerning the content of state law is in equipoise. But this maxim has its limits and should not be overused. The district court's north star, and one constitutionally mandated by *Erie,* is to discern, as best it can, the content of state law as the highest court of the state would view it today.

If Green Plains adequately amends its complaint, the district court should revisit its decision on the content of Nebraska law in a manner consistent with this opinion.

# I

# BACKGROUND

## A. Facts

This case comes to us from the district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We therefore take as true the allegations of the complaint and base this present recitation on those allegations.

Green Plains and ADM are two of the Country's largest ethanol producers, capable of producing, respectively, over 1 billion and 1.69 billion gallons of ethanol each year. Ethanol is a renewable fuel made primarily from corn and other grains. The United States produces over 16 billion gallons of ethanol annually. Federal law requires gasoline producers to blend renewable fuels, such as ethanol, into gasoline to be used as transportation fuel.[1] Ethanol purchasers may obtain ethanol directly from ethanol producers or from sales terminals located throughout the country.

Because most of the Country's ethanol production takes place in the Midwest, the industry treats the price set at the Kinder Morgan Argo Terminal ("Argo Terminal" or "Terminal" or "Argo") in Argo, Illinois, as the key indicator of the value of ethanol. The pricing service S&P Global Platts ("Platts") provides a benchmark price assessment that reflects the daily trading price of ethanol at the Argo Terminal. This "Chicago Benchmark Price" is calculated each day during the

---

[1] *See* 42 U.S.C. § 7545(o); *Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 602–03 (4th Cir. 2018) (providing background on the federal renewable fuel standard program).

Argo Terminal's Market-on-Close ("MOC") window. During the MOC window, buyers post bids and sellers post offers; when a bid and an offer match, a sale is consummated. Platts bases the Chicago Benchmark Price on the quantity and price of ethanol sold during the MOC window and deliverable to buyers between five and fifteen days forward from the date of sale. The Chicago Benchmark Price serves as a reference price for more than 70% of physical ethanol pricing locations around the country.

The price of ethanol futures contracts is also tied to the Chicago Benchmark Price.[2] In its complaint, Green Plains alleges that ADM began manipulating downward the price of physical ethanol at the Argo Terminal in November 2017. ADM's manipulation of the price of physical ethanol led to reduced profits for ADM and other producers selling ethanol at prices tied to the Chicago Benchmark Price. But ADM shielded itself from this downward trend. Although ADM would ordinarily be vulnerable to decreased contract prices in the same way as the other producers, ADM protected its bottom line by holding outsized short positions in the ethanol futures market and therefore profiting when the price of ethanol fell.

When the price of an underlying commodity falls, short positions in futures contracts pegged to that price turn a profit. Participants in futures markets speculate on the future price of an underlying commodity by buying or selling

---

[2] *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 675 (7th Cir. 2009) ("Changes in the demand for or the supply of the underlying commodity will make the price of a futures contract change over the period in which the contract is in force.").

futures contracts, which are "contract[s] for the sale of a commodity at a future date." *United States v. Dial*, 757 F.2d 163, 164 (7th Cir. 1985). Futures contracts "rarely result[] in actual delivery of the commodity," *id.*, but instead are often "cash settled," with payment occurring between the parties based on the difference between the original contract price and the final settlement price. *See Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) (quoting *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 542 (7th Cir. 1989)). Participants in the futures market can hold "long" or "short" positions. When the price of the underlying commodity rises, the "long" purchaser benefits; conversely, when the price of the underlying commodity falls, the "short" purchaser benefits. *Kohen*, 571 F.3d at 675. Short positions benefit from falling prices of the physical product because short sellers agree to sell a contract at the current going rate and then deliver at a later point. If the price of the product falls in the meantime, the short seller can then buy and deliver the contract at that lower price, profiting from the difference.[3] Investors taking short positions expect the contract's price to drop; if or when it does, the seller makes a profit.

Most commodity producers have an incentive to hedge their supply via short futures contracts in a manner consistent

---

[3] *See Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 859 (7th Cir. 1995) ("A short sale is a sale at a price fixed now for delivery later. A trader sells stock short when he thinks the price of the stock is going to fall, so that when the time for delivery arrives he can buy it at a lower price and pocket the difference. If, for example, he sells the stock short at 50 cents a share, and the price falls to 40 cents before he delivers the stock, he can buy the stock for 40 cents a share, deliver it to the buyer, and have made a profit of 10 cents.").

with their monthly production schedule, a practice that aims to reduce volatility in revenue. Hedging consistent with production ensures that producers are not overexposed to downturns in the market; if the price of ethanol declines, falling revenue will be partially offset by short sale gains. But Green Plains has alleged that ADM's behavior greatly exceeded expected hedging: ADM consistently held futures contracts that represented quantities more than twice as large as its monthly production of ethanol.[4] Because ADM held large quantities of short positions that increased in value when the price of ethanol decreased, ADM was not only protected from the falling price of ethanol, but profited from it.

According to Green Plains's complaint, ADM was able to effect this scheme by taking advantage of weaknesses at the Argo Terminal to drive down the price of physical ethanol. First, ADM fabricated an appearance of a surplus of ethanol by overwhelming the Terminal with conveniently-timed barges. The Terminal receives ethanol shipments via rail, truck, and barge. But its ability to handle large numbers of barge deliveries at once is limited: it has manpower and space to load and unload, on average, only two barges each day. Aware of the Terminal's limitations, ADM sent multiple barges into Argo at the same time, overloading its supply and unloading capabilities. And because Argo's ethanol capacity is limited to 1 to 1.2 million gallons of ethanol, the Terminal

---

[4] Each ethanol futures contract represents 1,000 barrels, or 42,000 gallons, of ethanol. Monthly hedging consistent with ADM's annual production of 1.69 billion gallons would equal about 141 million gallons, or about 3,350 contracts. During certain months, however, ADM acquired 6,000 to 7,000 futures contracts, representing 252 to 294 million gallons of ethanol.

was then forced to store ethanol in tanks, creating the appearance of an ethanol surplus and depressing prices.

Next, ADM began selling high quantities of ethanol at low prices during the MOC window. Prior to its alleged manipulation, ADM was a consistent *buyer* at the Argo Terminal. But ADM changed course beginning in November 2017. From then until October 2019, ADM was a frequent *seller* and accounted for nearly 70% of the total volume of physical ethanol sales at the Terminal during the MOC window. Under normal circumstances, ethanol sellers "negotiate" with buyers in the MOC window by gradually decreasing offers while buyers gradually increase bids until the two parties match. But ADM eschewed this established practice and aggressively and routinely offered the lowest prices and quickly accepted buyers' opening low-priced bids. Further, ADM frequently sold more ethanol during the MOC window than it could physically deliver and was often forced to purchase ethanol at a loss later in the month to satisfy its obligations. Finally, ADM repeatedly chose to sell at the Argo Terminal (and therefore continually exert its influence over the price) even though it could have made a profit by selling at non-Argo terminals operating at a price premium.

ADM's actions, the allegations continue, depressed the price of physical ethanol. Green Plains and the third parties that purchased ethanol from Green Plains used the Chicago Benchmark Price as a reference point for their contracts. Because ADM unlawfully depressed the price of ethanol, Green Plains received a lower price for its physical ethanol sales contracts tied to the Chicago Benchmark Price than it would have in the absence of ADM's manipulation.

## B. Proceedings in the District Court

In October 2021, Green Plains brought this action against ADM in the United States District Court for the District of Nebraska. It predicated federal jurisdiction on diversity of citizenship. *See* 28 U.S.C. § 1332. Based on the allegations just described, Green Plains presented a claim of tortious interference with contract. ADM moved to dismiss or to transfer the case to the Central District of Illinois. The Nebraska district court granted ADM's motion to transfer. Once in the Central District of Illinois, ADM renewed its motion to dismiss, contending Green Plains did not satisfy the elements for tortious interference with contract.[5] The district court agreed and dismissed the case with prejudice.

First, the district court concluded that Green Plains was required to allege specific contracts with which ADM had interfered. Although Green Plains had "alluded to various contracts," it had "not identified the third parties with whom [Green Plains] had the contracts, any other terms of those contracts, or what specific losses [Green Plains] suffered." *Green*

---

[5] Under Nebraska law, a typical tortious interference with contract claim has five elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted." *Pettit v. Paxton*, 583 N.W.2d 604, 609 (Neb. 2009) (citing *Miller Chem. Co., Inc. v. Tams*, 320 N.W.2d 759, 762 (Neb. 1982)). At times, the Nebraska Supreme Court has also reiterated that "one of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship." *Id.*; *Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig*, 529 N.W.2d 33, 40 (Neb. 1995) (same).

*Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 648 F. Supp. 3d 1028, 1033 (C.D. Ill. 2022). The district court held that, without such specificity, ADM did not have sufficient knowledge of the contracts with which it was alleged to have interfered.

Next, the district court determined that Green Plains had failed to plead a breach of contract. In its view, Green Plains could not state such a claim for relief because Nebraska tortious interference law ordinarily requires plaintiffs to prove that an actual breach occurred. Green Plains had not alleged that ADM had caused the third parties to breach; rather, it alleged that ADM caused Green Plains's completed contracts to be less profitable.

But absence of breach was no impediment to Green Plains's theory that, under Nebraska law, tortious interference does not always require a breach. This theory relied on section 766A of the Restatement (Second) of Torts. This provision allows a plaintiff to bring a successful tortious interference with contract claim on the ground that the defendant interfered with his contract by causing his performance to be "more expensive or burdensome" even if the contract was not breached. Restatement (Second) of Torts § 766A. Green Plains therefore submitted that because ADM's downward manipulation of the price of ethanol caused its contracts tied to that price to be less profitable, it had a viable claim under section 766A.

In their submissions to the district court, the parties disputed whether Nebraska state law recognized section 766A claims. Both parties relied on the Nebraska Supreme Court's decisions in *Pettit v. Paxton*, 583 N.W.2d 604 (Neb. 1998), and *Recio v. Evers*, 771 N.W.2d 121 (Neb. 2009). The district court

analyzed both decisions and reasoned that although "the Nebraska Supreme Court has not explicitly adopted or recognized § 766A and applied it to the facts under consideration, it has also not rejected that section out of hand or refused to recognize it as a cause of action under Nebraska tort law." *Green Plains*, 648 F. Supp. 3d at 1036. Later, the court continued: "[I]t could be inferred that, under the proper factual circumstances, the Nebraska Supreme Court would recognize § 766A-style claims as legitimate actions for tortious interference with contract." *Id.* at 1037.

Despite this conclusion, the district court refused to allow Green Plains to proceed on a section 766A claim. Notably, its refusal was based largely on its reading of our cases cautioning district courts sitting in diversity against expanding state law. These cases, in the district court's view, required that it "choose the narrower interpretation that restricts liability." *Id.* at 1038.

Consequently, the district court dismissed Green Plains's complaint with prejudice but noted that if it had determined that Nebraska law recognized section 766A claims, it would have allowed Green Plains to amend its complaint and attach specific contracts. Green Plains timely appealed.

## II

## DISCUSSION

Green Plains first submits that the district court's requirement that it plead specific contracts was excessive in light of Rule 8 of the Federal Rules of Civil Procedure and the standards articulated by the Supreme Court of the United States in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Green Plains further contends

that the district court erred by failing to recognize section 766A of the Restatement (Second) of Torts as part of the substantive law of Nebraska. Admitting that the Nebraska Supreme Court has not squarely applied this section of the Restatement, Green Plains nevertheless submits that, in both *Pettit* and *Recio,* that court necessarily acknowledged that section 766A was part of the state's law. We address each of these submissions in turn.

## A. Pleading Standards

We review a district court's dismissal of a complaint under Rule 12(b)(6) de novo. *West Bend Mutual Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Because Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A plaintiff must "'provide some specific facts' to support the legal claims asserted in the complaint." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)). And although "the required level of specificity 'is not easily quantified,' a plaintiff must allege 'enough details about the subject-matter of the case to present a story that holds together.'" *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) (quoting *McCauley*, 671 F.3d at 616).

In the circumstances presented here, the district court was on solid ground in requiring Green Plains to plead more than the generalized allegation that it had valid contracts with third parties for the sale of physical ethanol tied to the Chicago Benchmark Price. A claim for tortious interference with contract requires the plaintiff to plead that a valid contract existed and that the defendant knew about the contract. *Pettit*, 583 N.W.2d at 609. Although ADM conceivably could have a general understanding of the contracts to which Green Plains refers, "[a]n inadequate complaint will not survive a motion to dismiss simply because the defendants managed to figure out the basic factual or legal grounds for the claims." *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014). Something more than Green Plains's initial complaint is required. We do, however, caution the district court against requiring particularity akin to a Rule 9(b) requirement. Fed. R. Civ. P. 9(b). In rejecting Green Plains's complaint on specificity grounds, the district court found that "[p]laintiffs have not identified the third parties with whom they had the contracts, any other terms of those contracts, or what specific losses they suffered." *Green Plains*, 648 F. Supp. 3d at 1033. Green Plains must provide ADM sufficient notice of its claims, supported by nonconclusory factual allegations, *see Brooks*, 578 F.3d at 581, but Green Plains is not required to plead "the who, what, when, where, and how" required for claims of fraud or mistake under Rule 9(b). *Vexol, S.A. de C.V. v. Berry Plastics Corp.*, 882 F.3d 633, 637 (7th Cir. 2018) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Consequently, although the district court correctly determined that the validity of the contracts must be set out in the complaint, it is not self-evident that without further justification, more particular information is required at this early stage of the proceedings.

The district court specifically stated that, had it concluded that the Nebraska Supreme Court would recognize section 766A claims, it would have allowed Green Plains leave to amend its complaint. As we will explain below, the district court employed improper methodology in determining the content of Nebraska state law. On remand, if Green Plains satisfactorily amends its complaint, the district court should revisit its section 766A analysis, guided by the following clarification.

## B. Ascertaining the Content of State Law

In determining whether the district court erred in its assessment of Nebraska law, we set forth at the outset the fundamental principles governing this area. Indeed, resolution of this appeal turns on these basic principles, which are deeply rooted in our constitutionally-based federalism. As one treatise has emphatically stated, "[b]ecause of the important federalism concerns implicated in the application of state law by the federal courts, the accurate ascertainment of that law is extremely important." 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4507, at 170 (3d ed. 2016).

When a district court's jurisdiction is predicated on diversity of citizenship, it must apply the law of the state in which it sits, including that state's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie*, 304 U.S. at 78. We review a district court's interpretation of state law de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231–32

(1991).[6] We must apply state law as we believe the highest court of the state would apply it if the case were now before that tribunal rather than before our court. *See Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 203 (1956); *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1405 (7th Cir. 1994) (en banc). When the state's highest court has squarely addressed the issue, a federal court's task is straightforward: apply the law as determined by that court.[7] But when the highest court of the state has not spoken, ascertaining the present content of state law is often a delicate and, at times, arduous process. Frequently, we encounter significant ambiguity; our obligation, however, remains constant: We must ascertain, as best we can, the rule of law that the highest court of the state would apply if the case were now before it. We must "decide, not avoid" the question. *Daily v. Parker*, 152 F.2d 174, 177 (7th Cir. 1945). Accuracy in the determination of the content of state law is, moreover, a most serious responsibility because, as *Erie* makes clear, our determination implicates one of the most essential aspects of our constitutional federalism: the right of a state to determine, within constitutional bounds, the content of its state law. *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 634–35 (7th Cir. 2002) (noting the constitutional basis of *Erie's* holding); *Bernhardt*, 350 U.S. at 202 (same).

Given the importance of the undertaking, it is not surprising that the case law sanctions, indeed encourages, a broad

---

[6] *See also Leavitt v. Jane L.,* 518 U.S. 137, 145 (1996) (holding that the Supreme Court will not defer to a court of appeals determination as to the content of state law).

[7] *City of Chicago v. Morales*, 527 U.S. 41, 61 (1999); *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Mullaney v. Wilber*, 421 U.S. 684, 691 (1975).

inquiry by federal courts when faced with untangling ambiguity. We may consult "other persuasive authority" to determine what the highest court of the state would do if the case was before it. *Todd*, 21 F.3d at 1405; *see also McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662–63 (3d Cir. 1980).[8] We may look to the decisions of the state's other courts, including "considered dicta,"[9] for clues as to how the highest court of the state might resolve the open question. On occasion, the state's highest court's decisions in other, but somewhat parallel areas, may yield important clues as to how the court might resolve the issue. For instance, decisions in parallel areas may

---

[8] *See, e.g.*, *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 858–59 (7th Cir. 1992) (examining, in the absence of a decision from the state's highest court, the holding of a state intermediate appellate court and cases from other circuits).

[9] *McKenna*, 622 F.2d at 662. Without doubt, when considering dicta, the key phrase is "considered dicta." In *Todd*, we relied on our earlier holding in *Northwestern National Insurance Co. v. Maggio,* 976 F.2d 320, 323 (7th Cir. 1992). There we wrote:

> Judicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be taken out of context and treated as doctrines. We shouldn't like this done to our opinions and are therefore reluctant to do it to the opinions of other courts. No court, even a federal court in a diversity suit, is obliged to treat a dictum of another court (or, for that matter, its own dicta) as binding precedent.

*Todd*, 21 F.3d at 1411 (quoting *Northwestern*, 976 F.2d at 323). On the other hand, there is a significant difference between "mere obiter" and a "carefully considered statement by the state court." *McKenna*, 622 F.2d at 662 n.21 (quoting Charles Alan Wright, *Law of Federal Courts*, § 58, at 270 (3d ed. 1976)).

reveal fundamental policy choices and therefore cast a significant crosslight on the issue now before the federal court. *See, e.g., Toro Co. v. Krouse, Kern & Co., Inc.*, 827 F.2d 155, 161–62 (7th Cir. 1987) (relying on the Indiana Supreme Court's general approach to privity to resolve the appropriate standard with respect to accountant's liability). Finally, we may consult learned treatises and articles and, of course, the applicable Restatements.[10]

While canvassing these sources is helpful and necessary, the wide-ranging nature of the inquiry also presents the danger of it becoming undisciplined. Consequently, the federal courts have developed, over the years, certain maxims of self-discipline designed to ensure that our inquiry remains focused on its sole legitimate objective: ascertaining the law that the highest court of the state would articulate if our case were before it today.

Most prominent among these "guardrails" is the principle that, *in the absence of persuasive reasons to the contrary*, we will follow a holding of the state's intermediate appellate court. *Allstate*, 285 F.3d at 637. This safeguard is anchored in the very reasonable notion that a state's intermediate appellate courts engage in constant dialogue with the state's highest court and therefore have a sophisticated idea of the jurisprudential

---

[10] *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 721 (7th Cir. 1994) (noting court must look to cases from other jurisdictions, treatises, and restatements to ascertain Indiana law in absence of guidance from Indiana courts); *McKenna*, 622 F.2d at 662–63 ("[F]ederal courts may consider scholarly treatises, the Restatement of Law, and germane law review articles . . . ."); Wright, Miller & Cooper, *supra*, at 179–89.

vectors that its high court is setting.[11] Any state's jurisprudence contains, moreover, many rules of decision that never receive the scrutiny of the state's highest tribunal. These rules are, nevertheless, an integral part of the law of the state, and a federal court is not free to ignore their substance when seeking to ascertain the content of state law. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37 (1940).

Of course, a "guardrail's" role is to assist in staying on course. An overly rigid deference to the decision of an intermediate appellate court can easily distract a federal court from the constitutionally-based north star of its inquiry: what would the highest court of the state do if the present case was now before that court? Consequently, a federal court must be alert to indications that the highest court of the state might well reject the view of the intermediate appellate court. *See McGeshick v. Choucair*, 9 F.3d 1229, 1234 (7th Cir. 1993) (declining to follow intermediate appellate court's interpretation when it was contrary to the clear intent of the statute); *United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 583 (7th Cir. 2021) (considering, but ultimately rejecting, argument that intermediate appellate court case law conflicted with case law from the state's highest court).[12]

---

[11] *Cf. Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State . . . ."); Wright, Miller & Cooper, *supra*, at 142 ("[T]he decisions of the state's intermediate appellate court or courts constitute the next best indicia of what state law is . . . .").

[12] A division among state intermediate appellate courts on the issue militates towards certifying the issue to the highest court of the state. Indeed, such a certification not only ensures that the federal courts apply a definitive interpretation of state law but also affords the state's highest court an

We also have regularly employed another "guardrail." We have said, albeit in varying formulations, that a federal court, faced with two equally plausible readings of state law, should not choose the alternative that requires us to predict a change or an expansion in extant state legal doctrine. These cases suggest it is not our place to alter state law, but simply to apply it. *See Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987) ("[O]ur policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court.").

The district court relied on this decisional "guardrail" in deciding the present case, even though it predicted that the Nebraska Supreme Court would apply section 766A in an appropriate case. In short, it read our case law to say that a district court must always opt for the interpretation of state law that is the most restrictive, even when the evidence as to the content of state law is not in equipoise and, in fact, points to the less restrictive option.

Such an approach has troubling implications. It suggests that, in making the "*Erie* guess," a district court must choose the most restrictive interpretation of state law, even if the evidence before it indicates that the state court would choose a less restrictive alternative. This approach would render of secondary importance the basic constitutional mandate of *Erie* that we must ascertain and apply state law as the highest court of the state would articulate it today. Our cases counseling that we avoid expanding state law simply state the prudential rule that where the decisions of the state courts do not

---

opportunity to clarify its own law. *See United States v. Glispie*, 943 F.3d 358, 372 (7th Cir. 2019).

reveal a clear result and other traditional sources of information are also ambiguous about the present state of state law, we should not presume, without solid evidentiary support, that the state court would take a *significant* leap away from its established jurisprudence.[13] Any other course would risk interfering, based on significantly little support, with the state court's right to make policy choices on fundamental jurisprudential questions.[14]

Here, the district court seemed to believe that the Nebraska Supreme Court might well be willing to apply section 766A. Yet, it also believed that it could not take that course because it required applying section 766A for the first time in Nebraska without explicit direction from the Nebraska Supreme Court. But there is no such impediment to a district court applying the rule it believes the highest court of the state would apply. As we have noted earlier, a district court sitting in diversity has a fundamental constitutional obligation to apply the law it believes the state court would apply. Of course, if the evidence as to whether the Nebraska Supreme Court would apply section 766A was in equipoise, the district court could have determined, in its sound judgment, to resolve the conundrum before it by opting for the more restrictive

---

[13] *See, e.g.*, *Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 596 (7th Cir. 2017) ("We consistently have held that 'it is not our role to break new ground in state law.'") (quoting *Lopardo v. Fleming Cos., Inc.*, 97 F.3d 921, 930 (7th Cir. 1996)); *Dinerstein v. Google*, 73 F.4th 502, 516 n.4 (7th Cir. 2023) (noting that "innovative state law claims . . . should be brought in state court") (quoting *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000)).

[14] *See, e.g.*, *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996) ("We avoid speculation about trends in diversity cases . . . .").

approach and ruling that section 766A did not apply. But a district court should not fear adopting the "less restrictive" approach if it believes the state's highest court would adopt that approach.

We think that, if Green Plains satisfactorily amends its complaint, the district court should reexamine its earlier determination of the content of Nebraska law. On remand, the district court may determine, unburdened of any misapprehension about the contours of its duty to ascertain state law, that the information before it reasonably establishes that the Nebraska Supreme Court would adopt section 766A. But if it should believe that equally plausible arguments remain on both sides of the question, it may resort to the "guardrail" that it invoked in its earlier decision. The north star of the district court's decision-making process must always be to ascertain, as best it can, what the highest court of the state would do if the issue were before it today.

Finally, we respectfully invite the district court's attention to the possibility of certifying the section 766A issue to the Nebraska Supreme Court.[15] Use of this avenue to determine the content of state law might well become more viable if the

_____

[15] *See* Neb. Rev. Stat. § 24-219 ("The Supreme Court may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or a United States District Court, when requested by the certifying court, if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of this state.").

issue of the specificity of the complaint were resolved beforehand.

## Conclusion

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

The parties will bear their own costs of this appeal.

IT IS SO ORDERED.