Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/27/2026 08:09 AM CST

- 882 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

Green Plains Trade Group LLC et al., plaintiffs, v.
Archer Daniels Midland Company, defendant.

___ N.W.3d ___

Filed February 27, 2026.    No. S-25-127.

1. **Torts: Intent: Proof.** One of the basic elements of tortious interference
   with a business relationship is an intentional act which induces or causes
   a breach or termination of the relationship.
2. **Constitutional Law: Courts.** Article I, § 13, of the Nebraska
   Constitution does not create any new rights, but is merely a declaration
   of a general fundamental principle. It is a primary duty of the courts to
   safeguard this declaration of right and remedy, but where no right of
   action is given or remedy exists under either the common law or some
   statute, this constitutional provision creates none.
3. **Statutes: Legislature: Public Policy.** It is the function of the Legislature,
   through the enactment of statutes, to declare what is the law and public
   policy of the state.

Original action. Judgment entered.

David A. Domina, of Domina Law Group, P.C., L.L.O., and
John E. Tangren, Adam J. Levitt, Adam Prom, and Greg G.
Gutzler, of Dicello Levitt, L.L.P., for plaintiffs.

Maggie L. Ebert and John P. Passarelli, of Kutak Rock,
L.L.P., Scott P. Glauberman, Stephen V. D'Amore, Linda
T. Coberly, Samantha M. Lerner, and Michael J. Stepek, of
Winston & Strawn, L.L.P., for defendant.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and
Bergevin, JJ., and Alioth, District Judge.

- 883 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

Papik, J.

An Illinois federal court has asked whether this court would recognize a claim under § 766A of the Restatement (Second) of Torts (1979) (§ 766A). For reasons we will explain, we would not.

## I. BACKGROUND

### 1. Claim Based on § 766A

This case comes to us through a certified question from the U.S. District Court for the Central District of Illinois. A lawsuit between two ethanol producers, Green Plains Trade Group LLC (Green Plains) and Archer Daniels Midland Company (ADM), is currently pending in that court. Green Plains, headquartered in Nebraska, alleges that ADM, headquartered in Illinois, engaged in tortious interference with contract under Nebraska law.

Central to Green Plains' lawsuit is what is known as the Chicago Benchmark Price for ethanol. According to Green Plains, the Chicago Benchmark Price is the key indicator of the value of ethanol and is used as a reference price in many ethanol sales contracts throughout the industry. The Chicago Benchmark Price is promulgated by a pricing service and is based on the quantity and price of ethanol sold at a specific terminal in Argo, Illinois, during a certain window of time each day.

Green Plains claims that ADM took actions to intentionally drive down the Chicago Benchmark Price. Green Plains asserts that ADM did so by strategically timing large deliveries to the Argo terminal, as well as large below-market sales at that location.

According to Green Plains, ADM's actions resulted in additional profits for ADM and reduced profits for Green Plains and other ethanol producers. Green Plains claims that because it entered sales contracts based on the Chicago Benchmark Price, ADM's actions resulted in Green Plains receiving less money for its sales contracts than it otherwise would have

- 884 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

received. And, Green Plains alleges, ADM not only protected itself from the decrease in the Chicago Benchmark Price, but profited from it because ADM had acquired derivative contracts that became more valuable if the Chicago Benchmark Price went down.

In its complaint in federal court, Green Plains alleged that ADM's conduct amounted to a form of tortious interference with contract, recognized in § 766A.

## 2. Dismissal of Complaint by Illinois Federal District Court

ADM filed a motion to dismiss in the Illinois federal district court. It contended that Green Plains' complaint should be dismissed for multiple reasons, one of which was that the theory of tortious interference described in § 766A had never been adopted or recognized under Nebraska law.

The Illinois federal district court granted ADM's motion to dismiss. See *Green Plains Trade Group v. Archer Daniels Midland*, 648 F. Supp. 3d 1028 (C.D. Ill. 2022), *vacated and remanded* 90 F.4th 919 (7th Cir. 2024). The federal district court discussed prior decisions from this court that cited § 766A—*Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009), and *Pettit v. Paxton*, 255 Neb. 279, 583 N.W.2d 604 (1998)—but concluded that in those cases, this court neither recognized § 766A as a valid basis for a tortious interference claim under Nebraska law nor "rejected that section out of hand." *Green Plains Trade Group v. Archer Daniels Midland*, 648 F. Supp. 3d at 1036.

In the absence of a decision from a Nebraska appellate court expressly recognizing § 766A as a valid cause of action under Nebraska law, the federal district court concluded that it was obligated to "choose the narrower interpretation that restricts liability." *Green Plains Trade Group v. Archer Daniels Midland*, 648 F. Supp. 3d at 1037. Accordingly, the court "decline[d] to find that Nebraska common law recognizes tortious interference with contract claims as formulated

- 885 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

under § 766A." *Green Plains Trade Group v. Archer Daniels Midland*, 648 F. Supp. 3d at 1038.

### 3. Seventh Circuit Vacates
### Dismissal of Complaint

Green Plains appealed the dismissal of its complaint to the U.S. Court of Appeals for the Seventh Circuit. The Seventh Circuit vacated the dismissal and remanded the cause for further proceedings. See *Green Plains Trade v. Archer Daniels Midland*, 90 F.4th 919 (7th Cir. 2024). The Seventh Circuit concluded that the federal district court had erred by concluding that, in the absence of binding authority from this court, it was obligated to choose an interpretation of state law that restricted liability. The Seventh Circuit explained that the district court should have instead made a prediction as to whether this court would recognize a cause of action premised on § 766A.

The Seventh Circuit directed the federal district court, on remand, to predict whether this court would recognize a cause of action based on § 766A. Alternatively, it "invite[d] the district court's attention to the possibility of certifying the section 766A issue to the Nebraska Supreme Court." *Green Plains Trade v. Archer Daniels Midland*, 90 F.4th at 930.

### 4. Federal District Court
### Certifies Question

After remand, the federal district court followed the Seventh Circuit's certification suggestion. It entered an order stating that because it had determined there was no binding decision from this court as to whether a cause of action based on § 766A was viable under Nebraska law, it would certify a question to this court pursuant to Neb. Rev. Stat. § 24-219 (Reissue 2016). The federal district court certified the following question: "Would the Nebraska Supreme Court adopt § 766A of the Restatement (Second) of Torts in cases concerning tortious interference with a business relationship or expectancy?"

- 886 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

We entered an order accepting the certified question and directing the parties to file briefs addressing it. After the initial briefs were filed, we issued a supplemental briefing order, which we discuss in more detail in the analysis section below.

## II. ANALYSIS

### 1. Background Regarding Tortious Interference Claims

Before we directly address the certified question, we believe it helpful to set forth some background information regarding claims of tortious interference generally, as well as the specific theory of tortious interference discussed in § 766A. The Restatement (Second) of Torts discusses multiple types of claims of tortious interference, two of which we will mention here. One type is set forth in Restatement (Second) of Torts § 766 (1979) (§ 766), and the other in § 766A. Section 766 at 7 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

As the foregoing language indicates, § 766 envisions a scenario in which a party to a contract is induced by a third party to breach the contract. Under those circumstances, § 766 would allow the nonbreaching party to sue the third party for damages caused by the other party's failure to perform the contract. There is no dispute in this case that Nebraska law recognizes such a claim for tortious interference. See, e.g., *Pettit v. Paxton*, 255 Neb. 279, 583 N.W.2d 604 (1998).

What is disputed is whether Nebraska law recognizes a claim for tortious interference under an alternative scenario discussed in § 766A. That section provides:

- 887 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

§ 766A at 17. In this scenario, the question is not whether the would-be tort-feasor has induced the *other party* to the contract to breach. It is instead whether the would-be tort-feasor has, in the words of § 766A, "prevent[ed] the [plaintiff] from performing the contract" or "caus[ed] [the plaintiff's] performance to be more expensive or burdensome."

The theory of liability described in § 766A has not been uniformly recognized by courts. While some courts have "expressly approved the Restatement's rule of liability or at least assumed or implied that it is acceptable," others have rejected it. See Dan B. Dobbs et al., Dobbs' Law of Torts § 634 (Apr. 2025 update) (collecting cases). Compare *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, No. N10C-10-313 JRS CCLD, 2011 WL 1205138 (Del. Super. Mar. 31, 2011) (unpublished opinion) (adopting § 766A), and *Wilspec Tech. v. DunAn Holding Group*, 204 P.3d 69 (Okla. 2009) (adopting § 766A), with *Gemini Physical Therapy v. State Farm Mut. Auto.*, 40 F.3d 63 (3d Cir. 1994) (rejecting § 766A), and *Price v. Sorrell*, 784 P.2d 614 (Wyo. 1989) (rejecting § 766A).

As we mentioned above, the Illinois federal district court analyzed our decisions in *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009), and *Pettit, supra*, and determined that this court had neither adopted nor rejected the theory discussed in § 766A as a valid basis for tort liability in Nebraska. Before this court, however, both parties continue to resist that conclusion and contend that, in those cases, this court already resolved the issue of whether § 766A is a basis for liability under Nebraska law. Green Plains argues that we recognized

- 888 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

§ 766A as a basis for liability. ADM says we rejected it. We thus begin our analysis with the parties' arguments based on our decisions in *Recio* and *Pettit*.

## 2. This Court Has Not Previously
## Recognized or Rejected § 766A

Our decisions in *Recio* and *Pettit* referenced § 766A. Before we discuss those references and the parties' arguments based upon them, it is necessary to describe the underlying disputes.

In *Pettit*, a closely held family corporation wished to sell a parcel of real estate. The president of the corporation accepted an offer to purchase the real estate for $550,000, but, after doing so, continued to solicit other offers. Another party offered to purchase the real estate for $600,000. Due in part to a disagreement between the president and her children as to whether the second offer should be considered, the corporation failed to close the sale by the date specified in the first purchase agreement. The parties who made the first offer to purchase the real estate then filed suit, seeking specific performance of their purchase agreement. Later, the parties who made the first offer to purchase the real estate reached a settlement with the corporation whereby they agreed to pay an additional $50,000 for the corporation to perform under the purchase agreement. But as one lawsuit ended, another began. The purchasers of the real estate turned around and sued the party who made the second offer to purchase, alleging that his intentional interference with the purchase agreement caused $50,000 in damages. The district court granted summary judgment to the party who made the second offer to purchase.

[1] On appeal, we began our analysis of the tortious interference claim by observing that, under our precedents, one of the basic elements of tortious interference with a business relationship is "an intentional act which induces or causes a breach or termination of the relationship." *Pettit v. Paxton*, 255 Neb. 279,

- 889 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

286, 583 N.W.2d 604, 609 (1998). We then concluded that the purchasers in *Pettit* had failed to establish this element, because the corporation's failure to close on the closing date was not a breach of the purchase agreement, as closing occurred within a reasonable time after the specified date.

The purchasers, however, had argued that breach was not a required element of a tortious interference claim. They relied on § 766A in support. We noted this argument and quoted § 766A, but then stated that the theory described in § 766A did not apply to the facts of the case. We explained that in claims based upon § 766A, the plaintiff alleges that the defendant interfered with *the plaintiff's* performance of the contract. But in *Pettit*, we observed that the plaintiffs were alleging that the defendants interfered with *the corporation*. Having found no breach and rejecting the purchasers' argument that § 766A fit the circumstances of the case, we affirmed the district court's entry of summary judgment.

Both parties claim *Pettit* supports their respective positions. Green Plains points out that we cited and discussed § 766A, but simply found that it did not apply. Green Plains suggests that if § 766A were not a part of Nebraska law, we would have said so, rather than citing and discussing it. ADM, on the other hand, argues that this court rejected § 766A in *Pettit*, because we relied on precedent holding that breach or termination of a relationship is an essential element of a tortious interference claim.

In our view, both parties read too much into our decision in *Pettit.* Although we cited and discussed § 766A in *Pettit*, we did so in the context of addressing an alternative argument by the purchasers. We found that the purchasers' theory of liability did not fit within the parameters of § 766A, but we did not hold that § 766A was a valid theory of liability under Nebraska law. We thus reject Green Plains' argument to the contrary. But we also disagree with ADM's argument based on *Pettit*. Although we held that the purchasers' claims failed because they had not shown a breach of contract, it must be

- 890 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

recalled that we viewed *Pettit* as a case arising under § 766, not § 766A. See *Pettit*, 255 Neb. at 288, 583 N.W.2d at 610 ("[s]ection 766 applies where, *as here*, the plaintiff alleges that the defendant interfered with the third party . . ." (emphasis supplied)). Our application of the breach requirement in a case presenting a § 766 fact pattern sheds no light on the viability of a claim arising under § 766A. Our decision in *Pettit* neither adopted nor rejected § 766A as a basis for liability under Nebraska law.

We reach the same conclusion with respect to our decision in *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009). In that case, a professor reported to her university employer that another professor had sexually harassed her. After an investigation, the university placed the professor accused of sexual harassment on probation and directed her to undergo counseling. That professor responded by suing her accuser for tortious interference. In describing the complaint on appeal, we observed that it was not clear whether the plaintiff—the professor accused of sexual harassment—was alleging that the defendant—the professor who reported the sexual harassment—had caused the university to breach its contract with the plaintiff (a § 766 theory) or that the defendant had made the plaintiff's performance more difficult (a § 766A theory). We assumed for purposes of the opinion, however, that the plaintiff was pursuing a § 766 theory based on contractual breach by the university. We ultimately affirmed the district court's entry of summary judgment in favor of the defendant, concluding that the plaintiff's claim failed because any interference with a business relationship was justified. We also briefly observed, with citation to § 766A, that to the extent the plaintiff claimed that the defendant made the plaintiff's performance of the contract more difficult, that claim would fail because there was no evidence that the plaintiff suffered any loss from an alleged inability to perform her contractual duties.

Again, we conclude that our decision in *Recio* did not adopt or reject § 766A as a basis for liability under Nebraska

- 891 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

law. Our decision did not find liability based on § 766A. We assumed that the plaintiff was pursuing relief under § 766 and, in the alternative, determined that any claim based on § 766A would also fail. We are not persuaded by Green Plains' contention that citations to *Pettit* and a case from another jurisdiction discussing the viability of § 766A claims demonstrate that we recognized that § 766A was a valid theory of recovery under Nebraska law.

As the foregoing discussion demonstrates, we reach the same conclusion as the certifying court: Our precedents have neither recognized § 766A as a valid basis for a tortious interference claim under Nebraska law nor "rejected that section out of hand." *Green Plains Trade Group v. Archer Daniels Midland*, 648 F. Supp. 3d 1028, 1036 (C.D. Ill. 2022), *vacated and remanded* 90 F.4th 919 (7th Cir. 2024). This conclusion does not, however, end our analysis. The certifying court has not asked us merely whether this court *has* recognized or rejected § 766A as a valid basis for a tortious interference claim under Nebraska law; it has asked us whether we *would* recognize § 766A as a valid basis for a tortious interference claim under Nebraska law. We proceed to examine that question as an issue of first impression now.

### 3. Question of First Impression: Would We Recognize Claim Under § 766A?

In addition to their arguments based on our precedent, both parties also make alternative arguments as to why we should or should not recognize the theory described in § 766A as a matter of first impression. In their initial briefs before this court, both parties primarily stacked up decisions of other courts that have adopted or rejected § 766A as a theory of liability and made what we understand to be policy arguments as to why § 766A should or should not be recognized as a valid theory of tort recovery. Missing from both parties' initial briefs was significant discussion of the historical origins of the theory

- 892 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

described in § 766A, particularly whether the theory was recognized by English common-law courts.

In our view, however, the analysis of whether a tort theory of liability should be recognized as a matter of first impression ought to begin with the question of whether the theory has English common-law origins. We say so because in its nascency, Nebraska enacted a statute adopting, with some qualifications, the English common law as the law of Nebraska. In 1866, when Nebraska was still a territory, the Legislature enacted a statute that provided:

> So much of the common law of England as is applicable, and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, is adopted, and declared to be law within said territory.

Rev. Stat. ch. 7, § 1, p. 31 (1866).

After Nebraska became a state, the references to "territory" in the statute were changed to "state," but the rest of the statute was left in place and remains on the books today. See Neb. Rev. Stat. § 49-101 (Reissue 2021). This is what is known as a "reception" statute, which many American states enacted to recognize the authority of English common law within their borders in the absence of a binding statutory or constitutional provision. See Jud Campbell, *Determining Rights*, 138 Harv. L. Rev. 921, 941 (2025).

The ramifications of Nebraska's reception statute are discussed in more detail later in this opinion. For present purposes, it suffices to say that given Nebraska's adoption of English common law via statute, Green Plains would have a strong case that § 766A is a part of Nebraska's law if it could show that theory was recognized by the English common law at the time the reception statute was enacted.

Based on the foregoing, we directed the parties to submit supplemental briefs addressing whether the theory described in § 766A was recognized in the common law of England.

- 893 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
320 NEBRASKA REPORTS
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

The parties did so. Unsurprisingly, Green Plains argued that the theory described in § 766A was consistent with English common-law cases in existence at the time Nebraska's reception statute was enacted, and ADM argued otherwise. As we will explain, we are not persuaded by Green Plains' argument.

(a) English Common-Law Origins of § 766A?

At the outset, we note that in contending that the theory of liability summarized in § 766A is consistent with the English common law, Green Plains does not point to any English common-law decision or series of decisions that expressly recognized that a party was liable for actions that made another's performance of a contract more expensive or more burdensome. Indeed, it appears that there is universal difficulty in identifying the precise origins of the theory of liability described in § 766A. Comments to the Restatement discussing § 766A acknowledged that "[n]o single case has been identified as constituting the origin of this form of the tort . . . ." § 766A, comment *b.* at 18.

Rather than pointing to a specific case recognizing the theory of liability described in § 766A, Green Plains argues that the English common law broadly imposed liability on anyone who harmed others in their pursuit of an enterprise or occupation and that this broad rule naturally came to be applied in cases in which a party made another's performance of a contract more expensive or burdensome. In support of its contention that the English common law recognized this broad rule of liability, Green Plains relies on cases such as *Keeble v. Hickeringill*, (1707) 103 Eng. Rep. 1127 (K.B.), a case in which a landowner was held liable for firing gunshots to scare away waterfowl his neighbor had attempted to attract with decoys, as well as various ancient cases in which English courts imposed liability on those who prevented third parties from conducting business with plaintiffs. See, e.g., *Tarleton v. M'Gawley*, (1793) 170 Eng. Rep. 153 (K.B.); *Garret v. Taylor*, (1621) 79 Eng. Rep. 485 (K.B.). See, also,

- 894 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

Restatement (Second) of Torts § 766B, comment *b.* (1979) (collecting cases).

According to Green Plains, this broad principle later "crystallized into formal recognition of a tort for improper interference with contract," supplemental brief for plaintiff at 8, in the decision of *Lumley v. Gye*, (1853) 118 Eng. Rep. 749 (Q.B.)—a case in which one opera house was found liable for inducing a singer to breach her exclusive contract with another opera house. Citing to later American cases, Green Plains claims that the tort of contractual interference was eventually extended to cases in which a defendant's actions rendered a plaintiff's performance of a contract more expensive. See, e.g., *McNary v. Chamberlain*, 34 Conn. 384 (1867).

Although Green Plains has identified some broad language in certain English common-law decisions, we are not persuaded that those decisions were understood to create the broad rule of liability for which Green Plains argues. English courts later clarified, for example, that *Keeble* did not recognize a broad rule of tort liability, but was instead a nuisance case based on principles of property law. See *Allen v. Flood*, [1898] A.C. 1 (H.L.) 174 (appeal taken from Eng.) (explaining that *Keeble, supra*, "was decided on the ground that the act of the defendant was a wil[l]ful disturbance of the enjoyment by the plaintiff of his own land for a lawful and profitable purpose, and what is called in law a nuisance"). See, also, *All Star Awards v. HALO Branded Solutions*, 642 S.W.3d 281 (Mo. 2022) (recognizing that *Allen, supra*, characterized *Keeble, supra*, as nuisance case).

As for cases cited by Green Plains in which English courts found parties liable for driving away potential customers of others by violence, threats, or vexatious lawsuits, they have been subsequently understood as recognizing a specific tort referred to in England today as "unlawful means." See *Secretary of State for Health v. Servier Laboratories Ltd.*, [2021] UKSC 24. The unlawful means tort imposes liability when a defendant intends to harm the plaintiff by engaging in unlawful acts that

- 895 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

affect a third party's freedom to deal with the plaintiff. See *id.* This tort stands in contrast to § 766A, which imposes no requirement that the defendant's actions affect a third party's freedom to deal with the plaintiff.

Not only do we disagree with Green Plains that the cases it cites established the broad rule of common liability for which it argues, we also disagree with its assessment of *Lumley, supra. Lumley* did impose liability for interference with a contract, but it was a case in which the defendant induced a third party to breach its contract with the plaintiff. *Lumley* thus recognized the theory of liability that would later be described in § 766, not § 766A. Moreover, English courts have since clarified that the tort recognized in *Lumley* and the unlawful means tort are separate theories of liability rather than merely different applications of a single, broad theory of liability. See *Servier Laboratories Ltd., supra*.

This brings us finally to Green Plains' reliance on American cases with the following fact pattern: a plaintiff has a contract to maintain a road or bridge, but a third party comes along and damages the road or bridge in a way that makes the plaintiff's performance of the contract more onerous. See, e.g., *Cue v. Breeland*, 78 Miss. 864, 29 So. 850 (1901); *McNary v. Chamberlain*, 34 Conn. 384 (1867). Green Plains contends that the imposition of liability on the third party in these cases is consistent with the English cases discussed above and also demonstrates § 766A's common-law origins. We again must disagree. Setting aside the fact that these were American rather than English decisions, we are persuaded by commentators who have concluded that these decisions are best understood as cases in which the plaintiff is subrogated to sue for the trespass committed against the owner of the bridge or road, rather than the adoption of a tort with the breadth of § 766A. See, e.g., Dan B. Dobbs, Dobbs' Law of Torts § 634 (Apr. 2025 update) (setting forth subrogation theory and concluding that *McNary, supra*, and *Cue, supra*, "hardly support[] a general rule of liability for interfering with the plaintiff's performance"); Harvey

- 896 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61, 104, 105 (1982) (concluding that repair contract "subrogated the plaintiffs to the owners" and that *McNary, supra*, and *Cue, supra*, "announced no new principle of substantive tort liability").

In summary, we are not persuaded that the theory of liability described in § 766A was recognized by the English common law. We explore the significance of that conclusion in the remainder of this opinion.

### (b) Does Nebraska Constitution Compel Recognition of § 766A?

Green Plains argues that even if English common law did not recognize a claim for interference with a plaintiff's performance of a contract, this court can and should nonetheless recognize § 766A as a viable theory of liability under Nebraska law. In its supplemental brief, Green Plains argues that we can depart from the English common law when required by the state constitution. And, according to Green Plains, this court should recognize § 766A "to fulfill" the words of article I, § 13, of the Nebraska Constitution, which guarantees that "'every person, for any injury done him or her . . ., shall have a remedy by due course of law.'" Supplemental brief for plaintiff at 18.

We agree with Green Plains to the extent it contends that common-law rules in conflict with the state or federal constitution are not the law in the State of Nebraska. Our reception statute expressly states that only those parts of the common law "not inconsistent with the Constitution of the United States, with the organic law of this state, or with any law passed or to be passed by the Legislature of this state" are adopted as law within Nebraska. See § 49-101. Consistent with that statute, we have previously recognized that common-law rules must yield to the state constitution. See, e.g., *Corona de Camargo v. Schon*, 278 Neb. 1045, 776 N.W.2d 1 (2009);

- 897 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

*Wilfong v. Omaha & C. B. Street R. Co.*, 129 Neb. 600, 262 N.W. 537 (1935).

[2] We disagree with Green Plains, however, that article I, § 13, of the Nebraska Constitution compels the recognition of § 766A as a viable theory of liability under Nebraska law. This court has previously held that this constitutional provision does not create any new rights, but is merely a declaration of a general fundamental principle. *State ex rel. Tyler v. Douglas Cty. Dist. Ct.*, 254 Neb. 852, 580 N.W.2d 95 (1998). We have also said that it is a primary duty of the courts to safeguard this declaration of right and remedy, but where no right of action is given or remedy exists under either the common law or some statute, this constitutional provision creates none. *Id.* Accordingly, article I, § 13, of the Nebraska Constitution does not require the recognition of § 766A.

### (c) Green Plains' Policy Argument
### for Recognition of § 766A

In addition to its argument based on article I, § 13, of the state constitution, we understand Green Plains to argue that this court can and should recognize § 766A even if we conclude that it was not recognized in the English common law and even if we conclude that its recognition is not constitutionally compelled. In essence, we understand Green Plains to argue that we should recognize § 766A because it would make good tort policy for the State of Nebraska.

### *(i) Judicial Caution in Common-Law Innovation*

One could perhaps make an argument that a reception statute like ours compels courts to leave the common law as it existed at the time of the statute's adoption, permitting innovations to the common law to come only via statute or constitutional amendment. Indeed, at least one state supreme court appears to have determined its reception statute requires that type of restraint. See *Walmart Stores East, LP v. Leverette*, 321 Ga. 854, 917 S.E.2d 702 (2025) (holding Georgia law did not

- 898 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
320 NEBRASKA REPORTS
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

permit nontrivial nominal damages award because common law did not permit such awards and doctrine had not been modified or displaced by statute).

We, however, must acknowledge precedent from this court recognizing judicial authority to independently modify common-law rules. In the early days of the 20th century, Roscoe Pound wrote as a commissioner for this court that the reference to the "common law of England" in the precursor to § 49-101, see Comp. Stat. ch. 15, § 1 (1881), was not intended "to petrify the common law, as embodied in judicial decisions at any one time, and set it up [as an] inflexible form as a rule of decision." *Williams v. Miles*, 68 Neb. 463, 470, 94 N.W. 705, 708 (1903). Instead, it was understood that courts had the power to modify common-law rules "from time to time as changed conditions and new states of fact require." *Id.*

Several decades later, this court echoed Pound's earlier sentiment, stating:

> The adoption of the common law in the most general terms by any state would not admit of an unqualified application of all its rules without regard to local circumstances and the then present enlightened conception of reason and justice, for the common law is applicable only in so far as it is suited to the genius, spirit, and objects of its inten[d]ments affecting the society of the state.

*State v. Tautges, Rerat & Welch*, 146 Neb. 439, 444, 20 N.W.2d 232, 234-35 (1945). Similarly, a few years later, this court claimed the power "to modify the common law, adopting such of its principles as are applicable and rejecting such others as are inapplicable." *In re Estate of Lewis*, 148 Neb. 592, 602, 28 N.W.2d 427, 433 (1947). As these cases demonstrate, this court has historically claimed power to modify the common law independent of statute or constitutional amendment.

But even if no outside force prevents us from making new common-law rules or from modifying or abolishing old ones, we believe there are reasons for this court to be very cautious

- 899 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

about doing so. First, while it cannot be denied that English common-law judges recognized and modified legal doctrines based on sources other than a statute or some other statement of positive law, see, e.g., Antonin Scalia, A Matter of Interpretation (1997), it was universally recognized then, as now, that changes to the common law were to be gradual, see, e.g., *PM Group Life Ins. v. Western Growers Assur. Trust*, 953 F.2d 543, 547 (9th Cir. 1992) ("common law decisionmaking process is inherently incremental in nature" and "calls for devising a rule that does not stray too far from the existing regime"); *Price v. High Pointe Oil Co., Inc.*, 493 Mich. 238, 243, 828 N.W.2d 660, 663 (2013) (explaining that common law "typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances"); *State v. Lead Industries, Ass'n, Inc.*, 951 A.2d 428, 445 (R.I. 2008) ("evolution" of common law "takes place gradually and incrementally and usually in a direction that can be predicted"); Frederick Schauer, Thinking Like a Lawyer: A New Introduction to Legal Reasoning 119 (2009) ("common-law rules" are "developed incrementally and by accretion over time"); Richard A. Posner, *Blackstone and Bentham*, 19 J.L. & Econ. 569, 594 (1976) (describing English common-law system as "quintessentially incremental, indeed glacial"). It would be inconsistent with the gradual nature of common-law evolution for this court to adopt wholesale changes via individual judicial decisions.

[3] While changes to the common law have always proceeded incrementally, differences between the roles of English common-law judges and the roles of our judiciary today supply an additional reason for us to be cautious about even gradual common-law innovation. English common law judges were agents of the monarch. See *Elephant Ins. Company, LLC v. Kenyon*, 644 S.W.3d 137, 155-56 (Tex. 2022) (Young, J., concurring; Blacklock, J., joins) ("[i]n England, the judiciary

- 900 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
320 NEBRASKA REPORTS
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

was an arm of the king, after all"). They understood their task to be to discover or find the unwritten law based on sources such as custom and reason. See *id.* See, also, *Gamble v. United States*, 587 U.S. 678, 139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019) (Thomas, J., concurring). Most today, however, would recognize that the decision of whether to adopt or reject a particular tort theory of liability like § 766A is a question of public policy. See Oliver Wendell Holmes, Jr., The Common Law 1 (1st ed. 1881) (evolution of common law reflects the "felt necessities of the time, the prevalent moral and political theories, [and the] intuitions of public policy"). And we have consistently recognized that under our system of separated powers, it is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy of the state. See, e.g., *Lopez v. Catholic Charities*, 315 Neb. 617, 998 N.W.2d 31 (2023).

And for good reason. As some courts have observed, compared to judges, "the Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public." *Woodman ex rel. Woodman v. Kera LLC*, 486 Mich. 228, 246, 785 N.W.2d 1, 10 (2010). See, also, *Torres v. JAI Dining Services (Phoenix)*, 256 Ariz. 212, 536 P.3d 790 (2023) (Bolick, J., concurring) (contending that legislative branch is better suited to make policy than judicial branch). And although some might contend there remains room for judicial common-law innovation when it merely "fill[s] in the gaps" left by statutes, see *Kenyon*, 644 S.W.3d at 158 (Young, J., concurring; Blacklock, J., joins), we must also bear in mind the possibility that some "gaps" exist because the Legislature chose not to legislate on a particular subject.

Furthermore, it is more difficult to make the case for an active common-law-modifying judiciary today than it would have been in earlier eras. Perhaps an ample degree of judicial policymaking via common-law innovation was warranted in, for example, the 19th or early 20th centuries, when there was far less legislation pertaining to far fewer subjects. See

- 901 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

Charles M. Cook, The American Codification Movement: A Study of Antebellum Legal Reform 50 (1981) (citing early American legal commentator Nathan Dane, who estimated that in first half of 19th century "over 90 percent of the law in the states was common law"). As one surveys the scope of the Nebraska Revised Statutes (not to mention the Nebraska Administrative Code) of today, however, it is increasingly difficult to make the case that courts must be the institution that adjusts the law in response to societal changes. See, *Kenyon*, 644 S.W.3d at 158 (Young, J., concurring; Blacklock, J., joins) ("one basic premise of the common law—the need for courts to fill in the gaps because the rest of the government would [not] or could not—is less urgent than before"); *Kera LLC*, 486 Mich. at 246, 785 N.W.2d at 10 (contending that "[t]he need for a judiciary responsive to perceived public policy needs of the state" has been reduced by "modern legislatures exercise [of] robust regulation of [our] economy and the rights and responsibilities of citizens").

Finally, frequent judicial innovation of the common law risks a loss of predictability and stability in the law. As one state supreme court has described the common law, it is a "knowable judicial corpus and, as such, serves the important social value of stability." *State v. Lead Industries, Ass'n, Inc.*, 951 A.2d 428, 445 (R.I. 2008). To be sure, in some cases, it will be harder than in others to discern what the applicable common-law rule is. But any stability and predictability afforded by the common law will be significantly undermined if established common-law rules can be discarded and new rights and duties created simply because this court believes it can identify a superior public policy.

In light of the foregoing concerns, we are not inclined to recognize a cause of action not recognized by the common law in the absence of highly compelling reasons to do so. If there are equally compelling policy arguments both for and against recognition of the new cause of action, we are inclined to defer to the Legislature's judgment on whether the cause

- 902 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

of action should be recognized. Other state supreme courts have applied similar frameworks when asked to recognize new common law rights. See, *Price v. High Pointe Oil Co., Inc.*, 493 Mich. 238, 260, 828 N.W.2d 660, 672-73 (2013) ("when it comes to alteration of the common law, the traditional rule must prevail absent compelling reasons for change"); *Badillo v. American Brands, Inc.*, 117 Nev. 34, 42, 16 P.3d 435, 440 (2001) (concluding that while court had power to "create a common law cause of action," it would "construe such power narrowly and exercise it cautiously"). See, also, *Hulsh v. Hulsh*, 2025 IL 130931, ¶ 31, 272 N.E.3d 456, 465, 487 Ill. Dec. 402, 411 (2025) (although within judicial authority to adopt a restatement rule, "it is more appropriate for the legislative branch to decide whether a new cause of action should be created"); *Holmes v. Circo*, 196 Neb. 496, 505, 244 N.W.2d 65, 70 (1976) (declining to recognize cause of action not recognized at common law and observing that "decision should be left to the Legislature").

### (ii) We Decline to Recognize § 766A

With this standard in mind, we turn to Green Plains' argument that policy reasons strongly support the recognition of § 766A. We do not deny that there are policy reasons supporting the recognition of § 766A. As Green Plains argues, § 766A liability compensates a plaintiff for losses incurred when a defendant makes the plaintiff's performance of a contract more expensive or more burdensome and deters the defendant from engaging in such conduct. Green Plains asserts there is no reason not to impose liability in those circumstances. In recognizing § 766A, some courts have been receptive to such an argument. See, e.g., *Wilspec Tech. v. DunAn Holding Group*, 204 P.3d 69, 74 (Okla. 2009) ("[t]o predicate a cause of action solely on the identification of the breaching party and to deny recovery where plaintiff's performance is hindered or rendered more costly is without reason and a distinction this Court refuses to draw"); *Allen Family*

- 903 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

*Foods, Inc. v. Capitol Carbonic Corp.*, No. N10C-10-313 JRS CCLD, 2011 WL 1205138 at *5 (Del Super. Mar. 31, 2011) (unpublished opinion) ("[t]he Court can think of no rational basis to encourage behavior which would be tantamount to targeted tortious interference").

In our view, however, there are also reasonable policy arguments against recognizing § 766A as a theory of liability. As we mentioned at the outset of this opinion, some courts have expressly declined to recognize § 766A. In its decision declining to recognize § 766A, the Wyoming Supreme Court wrote that to recover under § 766A, a plaintiff was required to show only that his or her performance became more expensive or burdensome rather than demonstrating a breach or the loss of a prospective contractual relation. See *Price v. Sorrell*, 784 P.2d 614 (Wyo. 1989). In the Wyoming Supreme Court's view, a showing that performance of a contract became more expensive or more burdensome was "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Id.* at 616. See, also, *Gemini Physical Therapy v. State Farm Mut. Auto.*, 40 F.3d 63 (3d Cir. 1994) (predicting that Pennsylvania would not recognize § 766A for same reason).

In *Windsor Securities, Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655 (3d Cir. 1993), the U.S. Court of Appeals for the Third Circuit discussed potential drawbacks of § 766A in even more detail. That court observed that in a § 766A fact pattern, the defendant's actions are directed at the plaintiff, who will not be a "willing participant." *Windsor Securities, Inc.*, 986 F.2d at 662. Instead, the defendant's actions will normally involve "force, fraud, or other independently actionable conduct." *Id.* The court explained that in those cases, the plaintiff will be able to recover for "adverse effects on contract rights" as an element of damages for some other theory of recovery, *id.*; "'[t]hus in many cases interference with contract is not so much a theory of liability in itself as it is an element of damage resulting from the commission of some other tort, or the breach of some other contract,'" *id*. (emphasis omitted)

(quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 129 (5th ed. 1984)). In such cases, the court explained, recognition of § 766A would "duplicate protection already afforded through tort and contract." *Windsor Securities, Inc.*, 986 F.2d at 662. But, the court continued, "duplication comes at a cost. It risks chilling socially valuable conduct and creates new liability of uncertain dimensions." *Id.* Finally, the court cited a number of commentators critical of "the amorphous nature of the tortious interference principle, warning that its expansion is ill-conceived, threatening both fairness and efficiency." *Id.*

Unlike Green Plains, we also do not view the specific facts of this case as strongly supportive of a decision to recognize § 766A. Instead, those facts confirm our hesitation about independently recognizing it as a theory of liability. The end result of ADM's alleged conduct in this case was that ethanol was being sold to buyers at lower prices. It is difficult to see how that alone is a wrong that requires correction. And while Green Plains, assuming its allegations are true, received less money for those ethanol sales than it would have received but for ADM's actions, Green Plains did still receive what it contracted for—sales at the Chicago Benchmark Price. Green Plains' claim that it should receive more than that rests on its argument that ADM's actions constitute unfair competition that should not be permitted, or, at least, that a fact finder should have the power to decide whether those actions should not be permitted through application of § 766A.

In our view, however, consideration also must be given to whether there are other laws—state or federal—regulating competition that would independently cover ADM's alleged conduct. If ADM's actions are violative of some other law regulating competition, it is much harder to argue that liability under § 766A is needed. And if ADM's actions are not violative of some other law, it is not clear to us that this court, or courts generally, are best suited to determine whether

- 905 -

Nebraska Supreme Court Advance Sheets
320 Nebraska Reports
GREEN PLAINS TRADE GROUP v. ARCHER DANIELS MIDLAND CO.
Cite as 320 Neb. 882

such actions are nonetheless "improper" competition and thus tortious through application of § 766A.

We are not persuaded that we should recognize § 766A. Although there may be reasonable policy arguments that § 766A should be a basis for tort liability, there are, in our view, reasonable competing arguments to the contrary. This is, thus, the type of policy question that should be resolved by the Legislature rather than this court.

## III. CONCLUSION

For reasons we have explained, the answer to the certified question is, "No." This court would not recognize § 766A as a valid basis for tort liability in Nebraska.

JUDGMENT ENTERED.

MILLER-LERMAN, J., not participating.