JULIA L. PETTIT AND LINDA J. KEMP, APPELLANTS AND
CROSS-APPELLEES, V. RON PAXTON AND VICTOR PAXTON,
APPELLEES AND CROSS-APPELLANTS.

583 N.W. 2d 604

Filed August 28, 1998.    No. S-96-555.

Allen L. Fugate for appellants.

Keith A. Harvat and Terrance O. Waite, of Murphy, Pederson, Waite, Williams & McWha, for appellees.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

GERRARD, J.

## INTRODUCTION

This is an appeal from a summary judgment rendered in favor of the defendants by the district court. Julia L. Pettit and Linda J. Kemp, plaintiffs in the district court, and Ron Paxton and Victor Paxton, defendants in the district court, filed cross-motions for summary judgment. The district court denied Pettit and Kemp's motion for summary judgment, but granted summary judgment in favor of the Paxtons after finding that a real estate purchase agreement between Pettit and Kemp and a closely held family corporation, the Rodewald Ranch Corporation, was not a valid contract and that, therefore, Pettit and Kemp could not maintain an intentional interference with a business relationship action against the Paxtons. Pettit and Kemp appeal the district court's grant of summary judgment to the Paxtons and the denial of their motion for summary judgment. We affirm the judgment of the district court, albeit for a different reason, namely, that Pettit and Kemp failed to establish another essential element of the tort of intentional interference with a business relationship, i.e., a breach of the contract or termination of the business relationship at issue.

## FACTS

The Rodewald Ranch Corporation (the Corporation) is a closely held family corporation whose primary asset is a cattle ranch. Rodewald Ranch was originally owned by Betty and Edward Rodewald. Edward died, and Betty inherited a life

estate in the real estate. Betty and Edward's three adult children, Pamela J. Rodewald Schmidt, Blaine E. Rodewald, and Rhonda Rochelle Rodewald Kemp, inherited the remainder interest. Betty is remarried to Richard K. Schroeder, and in 1979, the real estate was transferred to the Corporation. Richard and Betty were the incorporators of the Corporation. Betty owns 5,752 shares of the Corporation outright and also has a life estate in 3,962 shares, and Richard owns 286 shares. Betty's three children each own an undivided one-third remainder interest in the 3,962 life shares and are also directors of the Corporation. Betty serves as president of the Corporation.

On January 29, 1988, the Corporation filed a chapter 12 bankruptcy in the U.S. Bankruptcy Court for the District of Nebraska. The Corporation's chapter 12 bankruptcy plan called for a $45,156.33 payment to Farm Credit Bank, due on December 1, 1990. The Corporation was going to be unable to make the scheduled payment, and therefore, Betty decided it was necessary for the Corporation to sell the ranch.

Without notifying her children, Betty contacted Joe Nutter, a licensed real estate broker, and on September 26, 1990, Betty, on behalf of the Corporation, entered into a real estate listing agreement with Nutter. The agreement listed for sale the real estate and all personal property owned by the Corporation for $600,000.

Nutter began soliciting bids on the ranch, and on October 1, 1990, Pettit and her sister, Linda Kemp, who are cousins of Ron Paxton, made an offer to purchase only the real estate for the sum of $550,000, and a downpayment of $25,000 was paid. On October 4, Betty, acting as president of the Corporation, accepted the Pettit-Kemp purchase offer subject to various additional terms and conditions, to which Pettit and Kemp agreed. Although Betty accepted the purchase offer during the day on October 4 by signing a purchase agreement, she testified by deposition that she directed Nutter that her acceptance would not be binding until midnight and that he was to accept any higher bids that came in between the time of her signing the purchase agreement and midnight, October 4.

At about 9:30 p.m. on October 4, 1990, Ron Paxton called Nutter and offered to purchase the ranch for $600,000. Nutter

told Paxton that the ranch had already been sold and that the Pettit-Kemp purchase agreement "was a done deal." Ron Paxton is Betty's cousin and had been told by Betty that bids would be accepted until midnight. We note that the record reveals a long-standing family feud between Betty's family and Pettit and Kemp's father. The record further shows that Ron Paxton also has a longstanding feud with Pettit and Kemp's father.

During October and November 1990, there were many informal meetings held between Betty and her children after the children discovered that Betty had signed the purchase agreement on behalf of the Corporation. Betty and her children disagreed over who should receive any profit realized on the sale and whether the Corporation should consider Ron Paxton's bid on the ranch despite the existence of the purchase agreement. The closing date specified in the purchase agreement was November 30, 1990, but by that date, Betty and her children had still not reached an agreement on their course of action. Although Pettit and Kemp appeared at the Corporation's attorney's office on the closing date and tendered the purchase price, certain prerequisites specified by Pettit and Kemp for the closing to occur, including the dismissal of the bankruptcy proceedings and formal approval of the sale by the directors and shareholders of the Corporation, had not taken place. Therefore, the closing did not occur on November 30.

During the time the informal shareholder meetings were taking place, Ron Paxton had numerous telephone conversations with Betty's son, Blaine. Additionally, Betty's son-in-law testified that Ron Paxton's father, Victor Paxton, approached the son-in-law and offered to help him buy a hog barn if he and Betty's daughter would make the Pettit-Kemp purchase agreement "go away." Victor Paxton denied making such an offer.

On December 17, 1990, Ron Paxton delivered a written offer to the Corporation's attorney to purchase the ranch for $700,000. The offer included a provision requiring the Corporation to indemnify Paxton from suits by any other party who may have had an agreement to purchase the ranch. On that same day, Pettit and Kemp filed the instant lawsuit against the Paxtons and Betty's son, Blaine, for intentional interference with the purchase agreement and obtained an ex parte tempo-

rary injunction in the district court. On December 21, Pettit and Kemp filed an adversary proceeding against the Corporation for specific performance of the purchase agreement in the U.S. Bankruptcy Court in the Corporation's chapter 12 bankruptcy proceeding.

On December 31, 1990, a formal meeting of the shareholders and directors of the Corporation was held. Pettit and Kemp were present in the building where the meeting was occurring. Eventually, Pettit and Kemp and the Corporation entered into a "Settlement Agreement," whereby Pettit and Kemp agreed to dismiss the specific performance action, to release their claims against Blaine, and to pay an additional $50,000 in exchange for the Corporation's performance of the purchase agreement. The settlement agreement contained a covenant by Pettit and Kemp not to sue the Corporation, with an express reservation of rights against the Paxtons. The evidence is in dispute as to whether Pettit and Kemp originally offered to pay the Corporation the additional money or whether the Corporation requested the payment. The necessary directors' resolution and shareholders' vote then occurred. The chapter 12 bankruptcy proceeding was dismissed by the Corporation on January 4, 1991, and on January 11, a closing occurred pursuant to the terms of the purchase agreement, as modified by the settlement agreement.

In the instant action, Pettit and Kemp are seeking to recover the extra $50,000 they paid for the ranch, claiming that the Paxtons' intentional interference with the purchase agreement caused the $50,000 damages. As noted in the introduction, the district court granted the Paxtons' motion for summary judgment because the court found that the purchase agreement was not a valid contract, the existence of which it held was necessary to maintain the cause of action. Specifically, the district court determined that under 11 U.S.C. § 363 (1988), any proposed sale of the property of a bankruptcy estate, other than in the ordinary course of business, requires the bankruptcy court's approval after notice and a hearing. Since no such approval was ever obtained, the district court found that it was impossible for the Corporation to have entered into a valid contract with Pettit and Kemp in October 1990 to sell the real estate at issue. The

district court went on to find that Pettit and Kemp's cause of action failed as a matter of law because the Corporation did not comply with the statute then applicable, Neb. Rev. Stat. § 21-2078 (Reissue 1991), which required that a sale of substantially all the assets of a corporation not in the ordinary course of business be approved by a resolution of the directors of a corporation and by a vote of two-thirds of the outstanding shares of a corporation, thereby rendering the purchase agreement void. In addition, even though the district court granted the Paxtons' motion for summary judgment, it specifically determined that there were genuine issues of material fact with respect to (1) the release of the Corporation by Pettit and Kemp, (2) whether Pettit and Kemp failed to mitigate their damages, and (3) whether the Paxtons acted in an unjustified, intentional manner, and therefore the court noted in its order that it did not sustain the Paxtons' motion for summary judgment with respect to those matters. Pettit and Kemp timely appealed the district court's grant of summary judgment to the Paxtons and the denial of their motion for summary judgment, and we removed the matter to our docket pursuant to our power to regulate the caseloads of the Nebraska Court of Appeals and this court.

## ASSIGNMENTS OF ERROR

Restated, it is alleged by Pettit and Kemp that (1) the district court erred in sustaining the Paxtons' motion for summary judgment because it incorrectly found (a) that Pettit and Kemp did not have a valid business relationship or expectancy with the Corporation; (b) that the bankruptcy court's approval was required to validate the purchase agreement between Pettit and Kemp and the Corporation prior to the closing of the sale of the real estate to Pettit and Kemp, and therefore the purchase agreement was void; and (c) that the Corporation did not comply with § 21-2078, which required that a sale of substantially all the assets of a corporation not in the ordinary course of business be approved by a resolution of the directors of a corporation and by a vote of two-thirds of the outstanding shares of a corporation, and therefore the Purchase Agreement was void; and (2) the district court erred in denying Pettit and Kemp's motion for summary judgment.

On cross-appeal, the Paxtons allege that the district court erred in finding that there were genuine issues of material fact with respect to (1) the release of the Corporation by Pettit and Kemp, (2) whether Pettit and Kemp failed to mitigate their damages, and (3) whether the Paxtons acted in an unjustified, intentional manner.

## STANDARD OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Marrs v. Keelan*, 254 Neb. 723, 578 N.W.2d 442 (1998); *Marshall v. Dawson Cty. Pub. Power Dist.*, 254 Neb. 578, 578 N.W.2d 428 (1998).

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 576 N.W.2d 817 (1998).

Although the denial of a motion for summary judgment is not a final order and thus is not appealable, when adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both motions and may determine the controversy which is the subject of those motions. *Elliott v. First Security Bank*, 249 Neb. 597, 544 N.W.2d 823 (1996).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Jackson v. Branick Indus.*, 254 Neb. 950, 581 N.W.2d 53 (1998); *Carpenter v. Cullan*, 254 Neb. 925, 581 N.W.2d 72 (1998).

## ANALYSIS

Pettit and Kemp's petition alleges that the Paxtons intentionally and improperly interfered with Pettit and Kemp's purchase agreement with the Corporation by offering to purchase Rodewald Ranch and by attempting to induce the Corporation or some of its shareholders to breach the purchase agreement. In their first summarized assignment of error, Pettit and Kemp

claim that the district court erred when it failed to find that Pettit and Kemp had a "valid business relationship or expectancy" with the Corporation.

We first formally recognized the tort of intentional interference with business relationships in *Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982), and set forth the elements of the tort as follows: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. We went on to acknowledge that one of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship. See, also, *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 247 Neb. 547, 529 N.W.2d 33 (1995).

Therefore, before we proceed to an extensive analysis of the errors assigned by Pettit and Kemp, it is only logical to determine whether or not the evidence supports a finding or inference that any wrongful act *induced or caused a breach or termination of the relationship* between Pettit and Kemp and the Corporation.

In the instant case, even though Pettit and Kemp's petition alleges that the Corporation failed to perform the contract due to the Paxtons' intentional interference, the record discloses that the contract was, in fact, performed after the petition was filed. The real estate closing did not occur on November 30, 1990, as specified in the purchase agreement; however, closing did take place on January 11, 1991, approximately 42 days later. We have stated that

> [i]n the ordinary contract for the sale of real estate, time is not of the essence unless provided in the agreement itself or clearly manifested by the agreement construed in the light of surrounding circumstances. Where time is not of the essence, performance must be within a reasonable time. [Citation omitted.] When a contract expressly provides for a specific closing date, performance is normally due within a reasonable time after the date mentioned.

*Frenzen v. Taylor*, 232 Neb. 41, 46-47, 439 N.W.2d 473, 477 (1989). Nothing in the purchase agreement or surrounding circumstances in this case indicates that time was of the essence.

The remaining question, then, is whether the 42-day delay between the time of closing specified in the purchase agreement and when the closing actually took place constitutes a "reasonable time for performance." The attorney for Pettit and Kemp sent a letter to the attorney for the Corporation on November 26, 1990, 4 days prior to the scheduled closing, outlining numerous requirements for the closing to occur, including dismissal of the bankruptcy, a resolution of the directors of the Corporation approving the sale, and production of minutes of a properly noticed shareholder meeting showing that the sale was approved by two-thirds of the outstanding shares of the Corporation. Given the lengthy list of requirements requested by Pettit and Kemp shortly before the scheduled closing date, 42 days was not an unreasonable amount of time for the Corporation to perform the contract. Accordingly, the Corporation never breached its contract with Pettit and Kemp, nor did the Corporation terminate its business relationship with Pettit and Kemp. Thus, one of the critical elements of the tort of intentional interference with business relationships is not supported by the evidence.

Nevertheless, Pettit and Kemp contend that actual breach is not a required element of the tort. In support of their position, Pettit and Kemp point to the Restatement (Second) of Torts § 766A (1979). The Restatement, *supra*, § 766A at 17, states that

> [o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Pettit and Kemp's reliance on § 766A is misplaced, however, because that provision does not apply to the circumstances present in the instant case. Comment *a.* to § 766A at 17-18 specifically states in part that the section

> is concerned only with the actor's intentional interference with the plaintiff's performance of his own contract, either

by preventing that performance or making it more expensive or burdensome. It is to be contrasted with § 766, which states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff.

Restatement (Second) of Torts § 766 at 7 (1979) provides:

> Intentional Interference with Performance of Contract by Third Person
>
> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The crucial distinction between §§ 766 and 766A is the party toward whom the allegedly intentional interference is directed. Section 766 applies where, as here, the plaintiff alleges that the defendant interfered with the third party (the party with whom the plaintiff contracted). Section 766A, on the other hand, applies where the plaintiff alleges that the defendant interfered with the plaintiff's own performance of the contract. Pettit and Kemp claim that the Paxtons intentionally interfered with the Corporation, not that the Paxtons intentionally interfered with Pettit or Kemp.

The reason for the distinction between §§ 766 and 766A is readily apparent. When, as described by § 766A, the interference is directed at the plaintiff and makes his or her performance more difficult, it will be possible for the plaintiff to establish causation. The plaintiff should be able to show that the defendant's actions directly caused the plaintiff's performance of the contract to be more difficult, thereby resulting in damages. However, when the defendant's interference is directed toward the third party, with whom the plaintiff has contracted, and the interference did not cause the third party to breach the contract, it is difficult to conceive how the plaintiff would prove causation. If the defendant was not interfering directly with the plaintiff, then whatever "damages" the plaintiff incurred were necessarily incurred as a matter of choice on the part of the plaintiff.

In the present case, for instance, Pettit and Kemp claim that the Paxtons' actions toward the Corporation caused Pettit and Kemp to pay $50,000 more than the original contract price to obtain performance of the purchase agreement. As a matter of law, Pettit and Kemp have failed to prove how any contact by the Paxtons to individual shareholders of the Corporation or an alternative offer by the Paxtons to purchase Rodewald Ranch caused Pettit and Kemp to pay $600,000 rather than $550,000 for the subject real estate. Although Pettit and Kemp may have believed that without paying the extra $50,000, the Corporation might not have performed on the purchase agreement, Pettit and Kemp's remedy was against the Corporation in the event that the Corporation failed to perform on the contract. Instead, Pettit and Kemp chose to go forward and close the real estate transaction with the Corporation by entering into a settlement agreement whereby Pettit and Kemp paid an additional $50,000 to the Corporation and agreed not to sue the Corporation with respect to the transaction. Therefore, because there was no breach of contract between the plaintiffs (Pettit and Kemp) and the third party (the Corporation), we conclude that no liability exists for the tort of intentional interference with a business relationship. The district court did not err when it sustained the Paxtons' motion for summary judgment and overruled Pettit and Kemp's motion for summary judgment.

Having so concluded, it is not necessary to consider any other assignments of error. Where the record demonstrates that the decision of the trial court is correct, although such correctness is based on a different ground from that assigned by the trial court, the appellate court will affirm. *Boettcher v. Balka*, 252 Neb. 547, 567 N.W.2d 95 (1997); *Siffring Farms, Inc. v. Juranek*, 252 Neb. 150, 561 N.W.2d 203 (1997).

## CONCLUSION

For these reasons, we affirm the judgment of the district court.

AFFIRMED.