Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/18/2026 08:09 AM CDT

## The Bar at the Yard, LLC, appellant, v. Friends Family, LLC, and Yin Family, LLC, appellees.

___ N.W.3d ___

Filed June 18, 2026.    No. S-25-243.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

3. **Torts: Intent: Proof.** In order to establish a claim for tortious interference with a business relationship or expectancy, a claimant must prove: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

4. **Torts: Intent.** One of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship.

5. **Contracts.** An individual's interest in prospective economic advantage receives less protection than his or her enforceable contract rights.

6. **Torts: Proof.** The party alleging tortious interference has the burden of proving that conduct did not fall within the competitor's privilege.

7. **Torts: Intent.** One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (1) the relation concerns a matter involved in the competition

between the actor and the competitor, (2) the actor does not employ improper means, (3) the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his or her interest in the competition with the other.

Appeal from the District Court for Lancaster County: KEVIN R. McMANAMAN, Judge. Affirmed.

Robert S. Sherrets, Diana J. Vogt, and Guillermo M. Martinez, of Sherrets Bruno & Vogt, L.L.C., for appellant.

Ronald F. Krause, Michael K. Huffer, and Samuel J. Brower, of Cassem, Tierney, Adams, Gotch & Douglas, for appellees.

CASSEL, STACY, PAPIK, FREUDENBERG, BERGEVIN, and VAUGHN, JJ.

PAPIK, J.

For well over a century, Americans have gathered on fall Saturdays at stadiums large and small to watch college football games. For nearly as long, it has been tradition for many of those same football fans to come together hours before the game to eat, drink, and socialize. In this case, a Nebraska business sought to capitalize on this tradition by selling beverages at a location near Memorial Stadium in Lincoln on home football game Saturdays. A bar that already operated in the area and that leased space from the same landlord objected to the presence of the would-be competitor. The bar claimed that when the landlord agreed to lease space to the new arrival, it breached a provision in the bar's lease that gave the bar an exclusive right to sell alcohol in the area. And when the newcomer refused to cease operations, the bar sued it, alleging that it had engaged in tortious interference with contract and business expectancy. The district court, however, entered summary judgment against the bar. It determined that there was no evidence that would allow a reasonable fact finder to

conclude that the new arrival did anything other than engage in valid competition. In this appeal filed by the bar, we find the district court did not err in entering summary judgment and thus affirm.

## I. BACKGROUND

### 1. The Parties

The parties to this lawsuit are, on one side, The Bar at the Yard, LLC, and on the other, Friends Family, LLC, and Yin Family, LLC. The parties, however, routinely refer to themselves and each other by other names under which they did business. We will follow their lead and refer to The Bar at the Yard as "Longwells" and Friends Family and Yin Family collectively as "Hiro 88."

### 2. Longwells Sues Hiro 88

This case began when Longwells sued Hiro 88. Longwells brought, among other claims not relevant on appeal, claims for tortious interference with contract and tortious interference with a business expectancy. Longwells asserted that Hiro 88 had sold alcohol in a manner that tortiously interfered with an exclusivity provision of Longwells' lease and with Longwells' relationships with its customers. As a remedy for the tortious interference, Longwells sought payment of all proceeds from Hiro 88's alcohol sales and an injunction stopping Hiro 88 from selling in the same manner in the future.

The operative complaint described Longwells' business practices before Hiro 88's alleged interference. Longwells leased a space from its landlord for operation of its restaurant and bar. Longwells sold food and drink in its restaurant and also through a window facing an outdoor space called the Common Area. The complaint alleged that Longwells' lease with its landlord gave it an exclusive right to sell alcohol in the Common Area. In particular, Longwells referred to language in the lease stating that the landlord would not "allow other tenants of the [b]uilding or third party vendors to sell

alcohol in the Common Area" and that the landlord would not itself sell alcohol "in or around" a space coextensive with the Common Area.

Longwells alleged that Hiro 88, which owned and operated a restaurant nearby, entered into an agreement with Longwells' landlord to operate in a space directly adjacent to the Common Area. A wall separated the Common Area from Hiro 88's space, but the wall contained windows that opened into the Common Area. Longwells alleged that Hiro 88's agreement with the landlord allowed Hiro 88 to sell alcohol from the adjacent space into the Common Area solely on the dates of Nebraska football home games. Longwells asserted that its most profitable days were those same Nebraska football game days.

When it learned of the agreement, Longwells sent Hiro 88 a cease-and-desist letter, in which it claimed an exclusive right to sell alcohol in the Common Area and demanded that Hiro 88 not go through with its plan. Longwells' complaint asserted that Hiro 88 ignored the letter and operated out of the space adjacent to the Common Area during two football seasons, selling alcohol through the windows to customers standing in the Common Area. According to Longwells, these sales interfered with the exclusivity provision of Longwells' lease, caused significant harm to Longwells, and "usurp[ed] hundreds of [its] customers."

### 3. SUMMARY JUDGMENT EVIDENCE

After the parties engaged in some discovery, Hiro 88 moved for summary judgment. In support, it offered an affidavit from a member of Hiro 88. Among other things, the member asserted that when Hiro 88 sold alcohol from the windows, its employees were stationed outside the Common Area and within Hiro 88's adjacent space. Attached to the affidavit were Hiro 88's agreements with the landlord authorizing it to operate out of the adjacent space. For the first year in which Hiro 88 operated out of the adjacent space, its agreement

required it to pay $65,000 for the right to use the space. In the second year, the agreement required it to pay $35,000.

In opposition to Hiro 88's motion for summary judgment, Longwells offered the affidavit of its owner and operator, Eric Marsh. The affidavit reiterated much of what was alleged in the complaint. Additionally, Marsh asserted that he would not have entered into the lease without the provision prohibiting the landlord from allowing others to sell alcohol in the Common Area; that Hiro 88 operated out of the space adjacent to the Common Area only during certain "peak" hours on days in which there were Nebraska football home games; that Hiro 88 had a different type of liquor license than Longwells and that under Hiro 88's license, customers were to stay within Hiro 88's assigned premises; that if Hiro 88 had not been operating out of the adjacent area, "each and every alcohol or other beverage purchase" would have been made from Longwells; and that Longwells made significantly less money on alcohol sales while Hiro 88 was operating.

Longwells did not offer any evidence concerning the negotiation of the agreements authorizing Hiro 88 to operate out of the space adjacent to the Common Area.

Hiro 88 objected to many paragraphs in Marsh's affidavit, mainly on the grounds that they lacked foundation or asserted legal conclusions. The district court sustained several of Hiro 88's objections and struck several paragraphs from the affidavit.

### 4. District Court Grants Summary
### Judgment to Hiro 88

In briefing submitted to the district court in support of its motion for summary judgment, Hiro 88 contended that there was no evidence it had induced the landlord to breach its contract with Longwells. Hiro 88 presented two arguments in support of this contention. It first argued that there had been no breach of the exclusivity provision in the lease between the landlord and Longwells. Hiro 88 argued that there was no

dispute that Hiro 88's employees stood in the adjacent space, rather than the Common Area, when selling alcohol. Hiro 88 argued that it therefore did not sell alcohol *in* the Common Area. And if it did not sell alcohol in the Common Area, Hiro 88 argued, the landlord had not breached the exclusivity provision and Hiro 88 had not induced a breach.

Alternatively, Hiro 88 argued that even if the landlord had breached the exclusivity provision, there was still no evidence that Hiro 88 had induced the breach. On this point, Hiro 88 argued that a party does not induce another to commit a breach of contract merely by entering into an agreement with the other with knowledge that the other cannot perform both the agreement and a contract with a third person. And Hiro 88 argued that because there was no evidence about the negotiations between Hiro 88 and the landlord for the agreements authorizing Hiro 88 to operate out of the space adjacent to the Common Area, there was no basis to find that Hiro 88 induced a breach of the exclusivity provision.

Following the hearing, the district court granted summary judgment to Hiro 88 on all of Longwells' claims. The district court analyzed Longwells' tortious interference with contract and tortious interference with a business expectancy claims together. It concluded that Hiro 88 was entitled to summary judgment on those claims because Longwells had failed to offer any evidence that Hiro 88's conduct "was beyond valid competition and therefore unjustified."

Longwells appeals.

## II. ASSIGNMENTS OF ERROR

On appeal, Longwells assigns many errors, but they can be condensed and restated as two: (1) The district court erred by granting summary judgment to Hiro 88 on the tortious interference claims, and (2) the district court erred in striking portions of Marsh's affidavit. Longwells does not assign error to the grant of summary judgment on its other claims unrelated to tortious interference.

## III. STANDARD OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023). An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Palmtag v. Republican Party of Neb.*, 315 Neb. 679, 999 N.W.2d 573 (2024).

## IV. ANALYSIS

We find that the district court did not err in granting summary judgment to Hiro 88. In the sections below, we first discuss general legal principles governing Longwells' tortious interference claims. Next, we explain why we find that Hiro 88 was entitled to summary judgment on those claims. Finally, we address Longwells' argument regarding the district court's evidentiary rulings.

### 1. Law Governing Tortious Interference

In its complaint, Longwells alleged claims of both tortious interference with contract and tortious interference with a business expectancy. We discuss legal principles governing both causes of action below, beginning with tortious interference with contract.

### (a) Tortious Interference With Contract

We recently had occasion in *Green Plains Trade Group v. Archer Daniels Midland Co.*, 320 Neb. 882, 31 N.W.3d 577 (2026), to discuss two different theories of tortious interference with contract mentioned in the Restatement (Second) of Torts (1979). One such theory is described in the Restatement

(Second) of Torts, *supra*, § 766 (§ 766), and the other is set forth in the Restatement (Second) of Torts, *supra*, § 766A (§ 766A). Because Longwells refers to both theories in its briefing, we summarize each, beginning with the theory described in § 766.

### (i) § 766

Section 766 at 7 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

The theory described in § 766 "envisions a scenario in which a party to a contract is induced by a third party to breach the contract." *Green Plains Trade Group*, 320 Neb. at 886, 31 N.W.3d at 580-81. This theory has deep roots in the English common law, see *Lumley v. Gye*, (1853) 118 Eng. Rep. 749 (Q.B.), and is widely recognized in American courts. See 9 Stuart M. Speiser et al., American Law of Torts § 31:40 at 564 (2020) ("today the doctrine of tortious interference with contractual relations is recognized and applied in almost all jurisdictions and as to virtually any type of contract").

This court, too, has recognized the theory described in § 766 as a valid basis for liability. See *Pettit v. Paxton*, 255 Neb. 279, 583 N.W.2d 604 (1998). See, also, *Dick v. Koski Prof. Group*, 307 Neb. 599, 680, 950 N.W.2d 321, 378 (2020) (discussing protection tortious interference cause of action provides for "enforceable contract rights"). But our formulation of the elements of this theory is slightly different from the description in the Restatement (Second) of Torts, *supra*. That is, partially because, in setting forth the elements, we have included tortious interference with contract within the broader cause of action of tortious interference with a

business relationship or expectancy, which we discuss in more detail below.

[3,4] We have said that in order to establish a claim for tortious interference with a business relationship or expectancy, a claimant must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damages to the party whose relationship or expectancy was disrupted. *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009). To this list of elements, we have added that one of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship. *Id.* See, also, *Pettit, supra* (finding that tortious interference claim was not established because there was no evidence of breach of contract or termination of business relationship).

### (ii) § 766A

In *Green Plains Trade Group v. Archer Daniels Midland Co.*, 320 Neb. 882, 31 N.W.3d 577 (2026), we also discussed the theory of liability described in § 766A. Section 766A describes a tort theory in which a third party is held liable for making the plaintiff's performance of a contract more costly or burdensome. Section 766A at 17 provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

In *Green Plains Trade Group*, a federal court asked this court whether we would recognize the theory described in § 766A. We declined to recognize the theory. We explained that

Nebraska precedent had not previously embraced nor rejected § 766A. We went on to decline an invitation to recognize the theory described in § 766A as a matter of first impression.

### (b) Tortious Interference With
### Business Expectancy

As noted above, in addition to recognizing the theory of tortious interference with contract, this court has recognized the theory of tortious interference with a business relationship or expectancy. See *Lamar Co., supra*. See, also, *Dick v. Koski Prof. Group*, 307 Neb. 599, 680, 950 N.W.2d 321, 378 (2020) (discussing protection tortious interference cause of action provides for "[a]n individual's interest in prospective economic advantage"). Our formulation of the elements of that theory is set forth above. This theory of liability is concerned with "intentional interference with prospective contractual relations, not yet reduced to contract." Restatement (Second) of Torts § 766B, comment *a*. at 20 (1979).

[5] We have recognized that an individual's interest in prospective economic advantage receives less protection than his or her enforceable contract rights. *Koski Prof. Group, supra*.

### 2. Hiro 88 Was Entitled to
### Summary Judgment

Now that we have introduced the theories of tortious interference Longwells relies upon, we explain why Hiro 88 was entitled to summary judgment.

### (a) Claims Under § 766A Are Not Viable

In its brief, Longwells relies in part on the theory of tortious interference with contract described in § 766A. But while Longwells' briefs were filed prior to the issuance of our decision in *Green Plains Trade Group, supra*, our decision forecloses any argument based upon that theory of recovery. Longwells acknowledged as much at oral argument. Because the theory described in § 766A is not a recognized theory of

liability in Nebraska, Longwells could not establish a valid claim based upon it.

### (b) Claim Under § 766 Fails for
### Lack of Inducement

Unable to rely on § 766A, Longwells is restricted to the general tortious interference with contract theory recognized in Nebraska and discussed in § 766. As explained above, to prevail on that theory, Longwells was required to establish that Hiro 88 committed an intentional act that induced or caused a breach or termination of the relationship. See, e.g., *Pettit v. Paxton*, 255 Neb. 279, 583 N.W.2d 604 (1998).

In this case, Longwells alleges that Hiro 88 induced or caused the landlord to breach the exclusivity provision of Longwells' lease. Hiro 88, on the other hand, denies there is any evidence that it induced or otherwise caused the landlord to breach the exclusivity provision. We agree with Hiro 88. As we will explain, even assuming that the landlord breached the exclusivity provision, there is no evidence that Hiro 88 induced or otherwise caused such a breach.

The comments to § 766 shed light on what it means to induce or cause a breach or termination of a relationship. One comment states that "'inducing' refers to the situations in which A causes B to choose one course of conduct rather than another." § 766, comment *h*. at 11. The comment adds, "Inducement operates on the mind of the person induced." *Id*. The comment then contrasts inducement with the phrase "'otherwise causing.'" *Id*. A tort-feasor otherwise causes a breach when he or she prevents a party from performing a contract. For example, a party who detains another so that he or she cannot perform a contract or destroys goods that a person is about to deliver pursuant to a contract otherwise causes a breach. See *id.* When, as here, there is no suggestion that the tort-feasor otherwise caused the breach, the plaintiff must rely on inducement.

Although one might suppose that inducement occurs anytime a party makes an agreement with another with knowledge that the other will have to breach another contract to perform the agreement, that is not the case. Merely offering to enter into an agreement "with knowledge that the other cannot perform both it and his contract with the third person" does not amount to inducement. § 766, comment *n*. at 14.

Inducement *can* occur when the alleged tort-feasor convinces a party to a contract to enter into another contract that will prevent him or her from performing the first contract. Take, for example, § 766, comment *m*. at 14, which provides an example of "[i]nducement by offer of better terms."

> A writes to B: "I know you are under contract to buy these goods from C. Therefore I offer you a special price way below my cost. If you accept this offer, you can break your contract with C, pay him something in settlement and still make money. I am confident that you will find it more satisfactory to deal with me than with C."

*Id.*, § 766, comment *m*., illustration 3 at 14. In this scenario, A has induced B to breach his contract with C. But, as mentioned above, not every offer made by A, even in similar circumstances, would constitute inducement. If A simply sends B his regular advertising, and B accepts it, and thereby breaches his contract with C, there is no cause of action against A. § 766, comment *m*.

Cases cited by Hiro 88 illustrate the principles above. In *Middleton v. Wallichs Music & Entertainment Co., Inc.*, 24 Ariz. App. 180, 536 P.2d 1072 (1975), an Arizona appellate court assumed there had been a breach of the contract at issue and went on to analyze whether the defendant had induced the breach. In describing inducement, the Arizona court stated that, to find liability, there must be evidence of "affirmative, unduly persuasive, initiating conduct on the defendant's part." *Id.* at 184, 536 P.2d at 1076. Because there was no such evidence, the court affirmed a directed verdict in favor of the defendant.

The 10th Circuit Court of Appeals came to a similar conclusion in *Zelinger v. Uvalde Rock Asphalt Company*, 316 F.2d 47 (10th Cir. 1963). In that case, a manufacturer changed distributors, and the initial distributor sued the new one for tortious interference with contract. Although the new distributor knew that the manufacturer was under contract, the 10th Circuit affirmed the grant of summary judgment to the new distributor, because there was "no evidence that it intentionally interfered with [the initial distributor's] contract or did anything to induce its termination." *Id.* at 51. Rather, the new distributor's "activities were limited to contracting with [the manufacturer] with knowledge that the contract could not be performed if the [initial distributor] contract continued in existence." *Id.* See, also, *Wolf v. Perry*, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959) ("[c]ontracting with a party with knowledge of a prior inconsistent contract between that party and another is not[,] according to the better view, the equivalent of inducement or persuasion").

Returning to this case, there is a dearth of evidence that Hiro 88 induced any breach of contract. Longwells did not offer any evidence that would allow a reasonable fact finder to conclude that Hiro 88 "operate[d] on the mind" of the landlord and convinced it to allow Hiro 88 to operate out of the space adjacent to the Common Area. See § 766, comment *h*. at 11. As we have noted, there was no evidence presented about the negotiations that led to Hiro 88's agreements with the landlord. The most the summary judgment record reveals about Hiro 88's agreements with the landlord is that Hiro 88 paid $100,000 over the course of 2 years for the right to operate out of the space adjacent to the Common Area. But without any evidence as to how the agreement came about or how that amount would compare to the market rate for such an agreement, a fact finder could only speculate about whether Hiro 88 had induced the landlord to enter the agreement and thereby eschew its contract with Longwells by offering highly favorable terms. But a conclusion that could

be reached based only on speculation does not create a material issue of fact. See *Kaiser v. Union Pacific RR. Co.*, 303 Neb. 193, 205, 927 N.W.2d 808, 816 (2019) ("[c]onclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment").

At oral argument, counsel for Longwells acknowledged the absence of evidence about how Hiro 88's agreements came about, stating, "I don't think there's evidence that it was [Hiro 88] that came in and induced [the landlord] to engage—the only evidence is they entered into this agreement." As we have discussed, however, the mere fact that a party entered into an agreement with knowledge that the other party to the agreement would have to breach an existing contract in order to perform the second contract does not amount to inducement.

Because there was no evidence that would have allowed a reasonable fact finder to find that Hiro 88 induced a breach of contract, the district court did not err in granting Hiro 88 summary judgment on Longwells' tortious interference with contract claim.

### (c) Tortious Interference With Business Expectancy Claim Fails

In support of Longwells' tortious interference with a business expectancy claim, it alleged that it had an expectancy interest in serving all customers in the Common Area who wished to purchase alcohol. It alleged that Hiro 88's activities interfered with that expectancy interest. But with respect to this claim, we agree with the district court that there was no evidence Hiro 88 was doing anything other than engaging in valid competition.

[6,7] We have said that valid competition, "including inducement of third persons to do their business with oneself rather than with a particular competitor, cannot be the basis for a tortious interference claim, because such conduct is

justified." *Dick v. Koski Prof. Group*, 307 Neb. 599, 680-81, 950 N.W.2d 321, 378 (2020) (internal quotation marks omitted). We have also said that the party alleging tortious interference has the burden of proving that conduct did not fall within the competitor's privilege. *Koski Prof. Group, supra.* One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (1) the relation concerns a matter involved in the competition between the actor and the competitor, (2) the actor does not employ improper means, (3) the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his or her interest in the competition with the other. *Id.*

On appeal, Longwells challenges the district court's conclusion that there was no evidence Hiro 88 was doing anything other than engaging in valid competition. It appears to suggest that there is evidence that would support a finding that Hiro 88 employed improper means in its competition with Longwells. On this score, Longwells draws our attention to its argument that Hiro 88 "violate[d] Longwells' exclusive right" to sell alcohol in the Common Area, to evidence that Hiro 88 sold alcohol out of the space adjacent to the Common Area only on certain days and times, and to its contention that Hiro 88 did not have an appropriate liquor license. Brief for appellant at 17. As we will explain, we are not persuaded that Longwells presented a genuine issue of material fact.

First, while Longwells argues that Hiro 88 violated Longwells' exclusive right to sell alcohol in the Common Area, as we have discussed above, there is no evidence showing Hiro 88 induced the landlord to breach the exclusivity provision. Even assuming the landlord breached the exclusivity provision, there was, at most, evidence that Hiro 88 knew that the landlord would breach the exclusivity provision by allowing Hiro 88 to sell alcohol out of the space adjacent to the Common Area. But as we have discussed above, a claim for tortious interference with contract cannot be premised

on such knowledge alone. And because we have recognized that an individual's interest in prospective economic advantage receives less protection than his or her enforceable contract rights, *Koski Prof. Group, supra*, we are persuaded that Longwells cannot establish that Hiro 88 employed improper means for purposes of a tortious interference with a business expectancy claim based solely on such knowledge either.

Longwells fares no better with its arguments that the limited hours Hiro 88 operated suggest that it was engaging in something other than valid competition. Even if Hiro 88 sold alcohol out of the space adjacent to the Common Area only during hours in which many people were congregated in the Common Area, we do not understand how that is anything other than a strategic business decision and a form of valid competition. Finally, as for Longwells' claim that Hiro 88 did not obtain the correct type of license for its activities, Longwells has not demonstrated that to be the case.

Because we find that Longwells could not establish that Hiro 88 engaged in anything other than valid competition, the district court did not err in granting Hiro 88 summary judgment on Longwells' tortious interference with a business expectancy claim.

### 3. DISTRICT COURT'S EVIDENTIARY RULINGS
### NOT ABUSE OF DISCRETION

Longwells also asserts that the district court erred when it struck portions of the affidavit of Marsh, Longwells' owner and operator. Longwells does not, however, as Hiro 88 points out, attempt to demonstrate the import of the stricken paragraphs. Regardless, we have reviewed the district court's evidentiary rulings and find that even if these rulings were erroneous, they would not have made any difference. The portions of the affidavits that were excluded would not have allowed a reasonable fact finder to conclude that Hiro 88 had induced a breach of the exclusivity provision or engaged in anything other than

valid competition, and thus, their exclusion had no bearing on Hiro 88's entitlement to summary judgment.

## V. CONCLUSION

Because we find that the district court did not err in granting summary judgment to Hiro 88, we affirm.

AFFIRMED.

FUNKE, C.J., not participating.